**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No.  13-cv-01751-RM-CBS

STEAK N SHAKE ENTERPRISES, INC., and
STEAK N SHAKE, LLC,

      Plaintiffs,

v.

GLOBEX COMPANY, LLC,
SPRINGFIELD DOWNS, INC.,
CHRISTOPHER BAERNS,
LARRY BAERNS,
KATHRYN BAERNS, and
CONTROL, LLC,

      Defendants.

---

**ORDER ON**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF NO. 11)**

---

THIS MATTER comes before the Court on Plaintiffs Steak n Shake Enterprises, Inc.

("SNS Enterprises") and Steak n Shake, LLC's ("SNS") (collectively, "Plaintiffs" or "Steak n

Shake") Motion for Preliminary Injunction  ("Motion for PI") (ECF No. 11) filed July 19, 2013,

arising from a franchise, license and area development agreement termination dispute.  Plaintiffs

seek an order to prohibit Defendants from using Plaintiffs' trademarks and to perform certain

post-termination obligations.  The Court held an evidentiary hearing on August 23, 2013.  Based

on the Motion for PI and other relevant papers, the evidence and arguments presented at the

hearing, and the applicable legal standards, the Court grants the Motion for PI in part and denies

the Motion for PI in part as set forth below.

# I.  PROCEDURAL BACKGROUND

Plaintiffs' lawsuit arises from: (1) Defendants Globex Company, LLC's ("Globex") and Springfield Downs, LLC's ("Springfield") (collectively, "Franchisees" ) alleged breaches of certain written franchise and license agreements (collectively, "Agreements") which allowed Franchisees to operate as Steak n Shake restaurants; and (2) Defendant Control, LLC's ("Control") alleged breach of a written area development agreement ("ADA") with SNS Enterprises which required Control to establish 13 franchised Steak n Shake restaurants as scheduled.  Individual Defendants Christopher Baerns, Larry Baerns, and Kathryn Baerns (collectively, "Guarantors") (Franchisees, Control, and Guarantors are collectively referred to herein as "Defendants") allegedly breached their personal guarantees of Globex's and Springfield's obligations under the Agreements.  (Amended Complaint ["AC"], ¶ 66.)

Plaintiffs assert that, after advising Franchisees of various defaults and providing a gratuitous, and ultimately unaccepted, opportunity to cure, they terminated the Agreements for cause, but Franchisees continued to use the Steak n Shake name and marks and to hold their restaurants out to the public as Steak n Shake restaurants.  Plaintiffs further allege that SNS Enterprises terminated the ADA for cause based on Control's failure to open a third franchised Steak n Shake as scheduled.  (AC, ¶¶ 20, 30-35.)  Plaintiffs contend Franchisees and Control have failed to comply with their post-termination obligations, such as the cessation of the use of the Steak n Shake marks.  (AC, *e.g.*, ¶¶ 40-44.)  Based on such allegations, Plaintiffs assert the following claims for relief: (1) Count I – Trademark Infringement; (2) Count II – Unfair Competition; (3) Count III – Breach of Contract – Specific Performance; (4) Count IV – Breach of Contract – Damages; and (5) Count V – Breach of Guaranty – Damages.

On July 19, 2013, Plaintiffs filed their Motion for PI which was set to be heard on August 23, 2013.  Prior to the hearing date, Defendants filed a Motion for Temporary Restraining Order which this Court denied after hearing.  (ECF Nos.  22 & 26.)  Defendants filed a renewed Motion for Temporary Restraining Order ("Renewed Motion"), which cured evidentiary deficiencies of the first motion, which this Court, after a telephonic hearing, granted in part by order ("Order") dated August 14, 2013.  (ECF Nos. 29, 30 & 32.)  In the Order, the Court specifically notified the parties that it was confining itself to the matters submitted with the Second Motion, no evidentiary hearing had been held, and the evidence then before the Court was sufficient to establish the requirements for a temporary restraining order ("TRO") and to allow Franchisees temporarily to operate their restaurants.  (Order, page 6.)  In contrast, this Court's order ruling on Plaintiffs' Motion for PI comes after an evidentiary hearing where all parties were afforded an opportunity to present testimony and other evidence for this Court's consideration.  The more fully developed record serves to clarify the true meaning of various claims and contentions made by Defendants in affidavits in support of the TRO, and to support the relief granted herein.

## II.  FINDINGS OF FACT

SNS owns federally-registered trademarks, service marks, trade names, logos, emblems, commercial symbols, and indicia of origin relating to the Steak n Shake brand and system, including the "Steak n Shake" mark and related marks (collectively, the "Marks").  (Plaintiffs' Exhibit [Ex.] 1, Declaration of Tonya L. Sallee ("Sallee Decl.").)  Plaintiffs have extensively used and promoted the Marks, and the products and services offered in association with those Marks, throughout the United States.  (Sallee Decl.)

In October 2008, Steak n Shake determined that it would carve out a singular position in the marketplace.  Steak n Shake determined that its restaurants would position themselves as that chain offering the highest value burgers and shakes at the lowest possible prices.  Accordingly, Steak n Shake implemented certain marketing campaigns and corresponding menu pricing, including 4 Meals under $4.  (Sallee Decl.)   In June 2010, Steak n Shake adopted uniform, low cost menu pricing and a mandatory promotions policy to be effective beginning with the September 2010 menu.  (Sallee Decl.)  In July 2010, Steak n Shake announced to its franchisees their required system-wide participation in this uniform policy.  (Sallee Decl.)

Globex and Springfield are Colorado limited liability companies, and their sole member is Control, also a Colorado limited liability company.  (AC, ¶¶ 6, 7 & 9.)  Control's members include Guarantors.  (AC, ¶ 9.)

On December 2, 2011, Control entered into the ADA with SNS Enterprises to establish a stated number of franchised Steak n Shake restaurants in accordance with a development schedule.  (Ex. 9.)  The first two restaurants Control "established" were through the 2012 acquisition of two pre-existing Steak n Shake restaurants in Sheridan and Centennial, Colorado, by Globex and Springfield.  (Ex. 10 [Sheridan], ECF No. 11-6, page 67; Ex. 12 [Centennial, ECF No. 11-4, page 68].)  This was accomplished through the execution of the Agreements with personal guarantees in 2012.  (Exs. 10 & 12.)

In order to reflect the plan to acquire two pre-existing restaurants and to provide for the development of more restaurants than contained in the ADA as originally executed, the ADA was amended on September 25, 2012 to recognize the intended acquisition of pre-existing restaurants as being developed under the ADA and, among other things, to require Control to

open a third franchise by June 2, 2013.  (Ex. 9, ECF No. 11-3, page 51.)  Pursuant to Section

7.04 of the ADA, Control is in default if it fails to meet the development schedule.  Pursuant to

Section 7.06(a), upon default, SNS Enterprises may terminate the ADA effective immediately

upon notice to Control.  Guarantors personally agreed to be bound by the post-termination non-

compete provisions of the ADA.  (Ex. 9, Appendix B.)

  On or about September 26, 2012, Globex and Springfield entered into franchise and

license agreements with SNS Enterprises and SNS, respectively, for the operation of the Steak n

Shake restaurants in Centennial (a/k/a Store 5301) and Sheridan (a/k/a Store 5302), respectively.

(Exs. 10-13; Sallee Testimony.)  Guarantors personally guaranteed Globex's and Springfield's

obligations under their respective franchise and license agreements and personally agreed to be

bound by the post-termination non-compete provisions of the franchise agreements.  (Exs. 10 &

12, Appendix B-1.)

  In connection with the franchise agreements, SNS Enterprises provided Franchisees with

electronic point of sale (POS) touch screen systems which contained *fixed* meal and a la carte

prices for purchases.  (Sallee Testimony; Ex. F.)   The fixed meal prices corresponded with those

prices shown on menus provided to Franchisees by Plaintiffs.  The menus offered "meals"

consisting of the combination of a sandwich and a side order, typically fries, for a stated price.  A

la carte pricing was available within the POS system (but not a typical menu option) in the event

that a customer wanted simply a sandwich and not a meal.  (*See* Ex. 51; Sallee Testimony.)

  The franchise agreements provided that each Franchisee:

(1) acknowledges that maintaining uniformity in every component of the operation of the

"System" is essential to the success of Steak n Shake restaurants, "including a designated

menu (including maximum, minimum, or other prices the Franchisor specifies for menu items and mandatory promotions)." "System" is defined to include advertising and promotional programs and menu, which SNS Enterprises may change in its sole discretion;

(2) agrees to serve, sell or offer for sale all of the (and only the) food and beverage products and merchandise listed in the then-current standard menu or menus specified by SNS Enterprises; and

(3) agrees not to deviate from SNS Enterprises' standards and specifications for serving or selling food and beverage products and merchandise, including prices and mandatory promotions, without SNS Enterprises' prior written consent.

(Exs. 10 & 12, §§ 1.1(R), 1.5(C), 4.1(A) & 4.1(C).)

Under Article 11 of the franchise agreements, SNS Enterprises may terminate the agreements effective immediately ("Immediate Termination") upon notice, with no required notice of default or opportunity to cure, for certain types of defaults. For other types of defaults, SNS Enterprises may terminate only after notice of default and Franchisees' failure to cure within 30 days of such notice ("30-Day Termination"). (Exs. 10 & 12, § 11.1.) As relevant to the parties' dispute, an Immediate Termination is permitted if Franchisees knowingly sell products for a price in excess of any maximum prices established by SNS Enterprises or knowingly fail to offer a mandatory promotion. (Exs. 10 & 12, § 11.1(A)(ii).) A 30-Day Termination is required if Franchisees fail to operate the restaurants in compliance with the standards prescribed by SNS Enterprises or default in the performance of "any other" term, condition or covenant not otherwise specifically covered by other termination provisions. (Exs.

10 & 12, §§ 11.1(B)(i) & (vii).)   For either "type" of "termination," the franchise agreements

state that notices of actions taken pursuant to Article 11 cannot be by facsimile or e-mail.  (Exs.

10 & 12, § 14.1.)

Upon the termination of the franchise agreements, Franchisees' rights under those

agreements cease.  Accordingly, for example, Franchisees are thereafter prohibited from using

any secret recipes; confidential information; manual; proprietary information; the Marks; Steak n

Shake exterior and interior design; and a Steak n Shake telephone number and web address.

(Exs. 10 & 12, § 11.2.)

The Marks are those which the license agreements grant Franchisees the non-exclusive

right to use during the term of the franchise agreements.   (Exs. 10 & 12, § 1.1(M); Exs. 11 & 13,

§§ 1.1 & 1.3.)  All rights granted under the license agreements automatically terminate without

notice to Franchisees if they are in default under Article 11 of the franchise agreements beyond

such cure period, if any, provided for in such agreements.  (Exs. 11 & 13, Ex. D §§ 2.2(c)

& 2.3(b).)

At the time the franchise agreements were executed, Steak n Shake's menus offered a

variety of meals for various prices, including a long standing promotion of 4 meals for under $4.

SNS Enterprises rolled out a new promotion for the summer of 2013 which introduced a new

premium sandwich meal (the Bleu Ribbon Steakburger meal) and a new $4 menu which greatly

expanded the original 4 meals under $4 promotion.  A special new $4 menu was prepared in

which all *meals* on that menu were under $4.  (Ex. 20, Decl. of Matt Morarity; Ex. 51)  This $4

menu was a special insert to be placed in the regular Steak n Shake lunch/dinner menu which

continued to offer other meals at other prices, including some $4 meals.

On April 26, 2013, SNS Enterprises delivered to Franchisees the 2013 Summer Promotional Guide along with in-store marketing materials, including new $4 menus, server buttons for the $4 menu, window clings for the $4 menu, and a drive-thru extender board for the new $4 menu.  (Decl. of Morarity; Sallee Testimony.)  The new $4 menus offered each meal for $3.99, were laminated, and were to be inserted into each lunch/dinner menu and available from 11:00 a.m. until 6:00 a.m. every day.  (Ex. 20, pages 16, 18, 34; Ex. 51; Sallee Testimony.)  Consistent with prior practice and the meals offered in the regular menu, there was no a la carte pricing for the meals in the new $4 menu inserts.  (Ex. 51.)  The promotion went live on May 1, 2013.  (Ex. 20, pages 12 & 16.)

Shortly after the promotion began SNS Enterprises began receiving complaints that Franchisees were overcharging customers and not using the $4 menu.  (Sallee Decl.)  On May 16, 2013, Elvin Leonardo, an SNS Enterprises employee, visited Franchisees' restaurants.  (Ex. 31; Sallee Testimony.)  Mr. Leonardo obtained and returned to Plaintiffs documents showing the restaurants were using preprinted menus that looked like true Steak n Shake menus but which increased the prices contained in the true menus.  Franchisees were serving the $4 *meals* from the new $4 menu, but at higher prices.  Both restaurants were missing any promotional materials which advised the customers that there was a new selection of meals available at a price of under $4.  The restaurants were missing the new $4 menu on the drive-thru menu board; were not using server buttons or in-store promotional materials provided in connection with the summer promotion; and only the professionally altered menu inserts were available to customers.[1]  And, as for the new Bleu Ribbon Steakburger meal, both restaurants' menu boards and table cards had

---

[1] For example, Franchisees changed the heading of the hot dog meals from "*$4* Footlong Meals" to "*Grilled* Footlong Hot Dogs." (Ex. 1 [Plaintiffs' Ex. 31] and Ex. 2 [Plaintiffs' Ex. 51], attached; italics supplied.)

white stickers covering the original prices for the combo meal and showing a higher price. (Ex. 31; Sallee Testimony.)

The prices being offered by Franchisees were not randomly generated. What they were doing instead involved a manipulation of the POS system. Rather than entering a meal when one was ordered by the customer, the Franchisees were ringing in the meal items as a la carte items thereby generating a higher price for the meal. For example, SNS Enterprises' $4 menu required the Jamaican Jerk Double Steakburger and fries combo *meal* to be sold for $3.99 as a *meal*. (Ex. 51; *see* Sallee Testimony.) Franchisees, however, charged customers $5.08 for that $3.99 meal under their altered menus and were able to do so by ringing up the two items a la carte ($3.29 for the burger + $1.79 for the fries) rather than as a meal in the POS system, thereby increasing the price by more than twenty-five percent (25% ) [$5.08 -$3.99 = $1.09/$3.99 = 27%]. (*See* Ex. 31, pages 3 and 13, & Ex. 51, attached hereto as Exs. 3, 4 & 5, respectively.) Franchisees acknowledged that on May 16, 2013, every customer who walked into their restaurants were given the *altered* "$4 menu" which charged the a la carte prices for combo meals. (Christopher Baerns ["Baerns"] Testimony.)

On May 23, 2013, SNS Enterprises remotely disabled the a la carte functionality in Franchisees' POS systems so that customers could not be charged for combo meals at higher prices than those established by Steak n Shake (*i.e.*, the maximum prices) and shown on its authorized menus. (Sallee Testimony.)[2] Once Franchisees could no longer use the a la carte pricing function, they were unable to use the *altered* menus with their higher prices. Therefore, they returned to using the original menus. But the use of the $4 menu insert was another story

---

[2] Nonetheless, Franchisees could still offer customers a la carte pricing if they only wanted a sandwich/burger by using the discount function and giving that customer a $0.70 discount from the $3.99 meal ($3.99 - $0.70 = $3.29).

entirely.  Rather than offering the authorized menu in the same manner as the altered menu had

been offered, Franchisees simply stopped handing out to every customer the authorized $4 menu.

(Baerns Testimony.)

Thereafter, Defendants' counsel wrote to SNS Enterprises requesting that all

communications regarding its "mandatory maximum pricing requirements," the $4 menu, and

the restrictions on the POS system be directed "solely" to Defendants' lawyers.  (Defendants'

Response to Motion for PI, ECF No. 27-1, Ex. 1.)

Although required to do so under the terms of the amended ADA, Control did not open a

third Steak n Shake franchise by June 2, 2013.  (Sallee Testimony.)  Control had been unable to

secure financing to open a third location.  (Sallee Testimony.)

From June 2 through June 9, 2013, SNS Enterprises' franchise director, Kyle Whitney,

was scheduled to conduct breakfast training for Franchisees at the Sheridan restaurant and, on

June 4, 2013, conducted a short form "QSC" (quality service control) at the Centennial

restaurant.  (Whitney Testimony.)  From these visits, Mr. Whitney determined Franchisees were

not offering the $4 menu through any medium at the Sheridan restaurant and not using the $4

menu extender at the drive-thru at the Centennial restaurant.   Mr. Whitney did not notice

whether $4 menus were available at the Centennial restaurant, but Franchisees had previously

told him that neither store was using the $4 menu.  (Sallee Testimony; Whitney Testimony; Ex.

37.)  Franchisees told Mr. Whitney that they honored the $4 menu only if it was requested by a

customer.  (Whitney Testimony.)

By letter dated June 18, 2013, sent by e-mail, Plaintiffs notified Franchisees, via their

counsel as previously requested, they were in default under the franchise agreements based on

their failing to offer the $4 menu; printing menus without SNS Enterprises' consent; altering of marketing materials; and charging prices higher than SNS Enterprises' published menu prices. (Motion for PI, ECF No. 11-8.)  SNS Enterprises stated it had no obligation to do so but was nonetheless providing Franchisees with notice and an opportunity to cure these violations. Franchisees could cure by complying with the following requirements on or before 5:00 p.m. on June 20, 2013: (1) begin offering the $4 menu to all guests at all times; (2) display all marketing materials related to the $4 menu pursuant to the current marketing promotional guide; (3) agree in writing to participate in a Mystery Shop program as permitted under Section 5.1(D) of the franchise agreements; and (4) agree in writing to pay SNS Enterprises' travel expense to conduct a follow-up inspection to confirm compliance with these requirements.  (Motion for PI, ECF No. 11-8.)

Franchisees received Plaintiffs' June 18, 2013 letter and responded by e-mail dated June 19, 2013.  In that e-mail, Franchisees denied these asserted violations were "occurring."  (Baerns Decl.)  In an e-mail sent the next day, in an effort to convince Plaintiffs that the stickers altering the price of the Bleu Ribbon Steakburger meal had been removed, Franchisees provided pictures of their restaurants' drive-thru menu boards.  But the pictures meant to show cessation of the price alteration in one area showed alteration of menu options in another.  The Sheridan location's menu board had been altered to cover the offering of $1.79 regular size beverages, thereby providing customers only the option of purchasing large or $1.99 beverages.  (Sallee Decl., Ex. 3.)  SNS Enterprises followed with an e-mail which, among other things, reiterated that the $4 menu needed to be placed inside each of the lunch/dinner menu.  (Ex. 35.)

On June 21, 2013, Mr. Whitney again visited the two restaurants.  (Whitney Testimony.)

He visited the Sheridan store from about 11:00 a.m. to 6:00 p.m. and there were no $4 menus

offered or promotional materials posted.  (Whitney Testimony; Ex. 37.)  The Sheridan

restaurant's manager told Mr. Whitney the $4 menu was "offered" when it was requested by the

customer.  (Whitney Testimony; Ex. 37.)  On his way to the airport, Mr. Whitney visited the

Centennial store but did not see the $4 extender at the drive-thru or any $4 menus in the host

stand where the menus were kept.  (Whitney Testimony.)

By letter dated July 3, 2013, Plaintiffs notified Franchisees and Guarantors via personal

delivery of the termination of the franchise and license agreements effective immediately.

Notice was provided pursuant to Section 11.1(A) of the franchise agreements and Section 2.2 of

the license agreements and based on Franchisees': (1) intentional deviation from SNS

Enterprises' menu prices; (2) alteration of marketing materials; and (3) failure to cure the

violations outlined in the June 18, 2013 letter.  (ECF No. 11-9.)  In a separate July 3, 2013, letter,

Plaintiffs notified Control and Guarantors the ADA was terminated effective immediately for

failure to develop and open a third Steak n Shake location by June 2, 2013.  (Ex. 39.)  Also on

that date, Plaintiffs filed suit against Defendants.

### III.  ANALYSIS

#### A.    Preliminary Injunction Standard.

Plaintiffs seek to enjoin Defendants' alleged trademark infringement and unfair

competition and enforce their post-termination obligations under the franchise, license and area

development agreements.  (Motion for PI, page 2.)  A preliminary injunction is an extraordinary

remedy, so the right to relief must be clear and unequivocal.  *Schrier v. University of Colo.*, 427

F.3d 1253, 1258 (10th Cir. 2005).  A party seeking injunctive relief must establish four factors: (1) it will suffer irreparable harm if the injunction is not granted; (2) the threatened injury outweighs the harm caused to the opposing party as a result of the injunction; (3) the injunction, if issued, is not adverse to the public interest; and (4) it has a substantial likelihood of success on the merits of the case.  *Id.*

The purpose of a preliminary injunction is to preserve the relative positions – the status quo – of the parties until a trial on the merits can be held.  *Id.*  The status quo is the "'last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'"  *Id.* at 1260 (quoting *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001)).

Where the injunction sought is prohibitory, *i.e.*, requiring the nonmovant to stop acting in a manner that disturbs the status quo, the movant may be afforded relief under a lesser standard of proof on the likelihood-of-success-on-the-merits factor if it can show the other three requirements tip strongly in its favor.  *Oklahoma, ex rel, Okla. Tax Comm'n v. International Registration Plan, Inc.,* 455 F.3d 1107, 1112-1113 (10th Cir. 2006).  Where the injunction sought is one of three types of disfavored injunctions, however, the modified standard is inapplicable. Additionally, the movant must make a heightened showing to demonstrate entitlement to relief. *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (*en banc*), *aff'd and remanded,* 546 U.S. 418 (2006) ("*O Centro*").  The request must be more closely scrutinized to assure that the exigencies of the case require extraordinary interim relief. *O Centro, supra* at 975, 978-979.

The three disfavored injunctions are: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Schrier v. University of Colo., supra* at 1258-1259. Mandatory injunctions generally alter the status quo, but that is not always the case. Regardless of whether they alter the status quo, they are still disfavored because they "'require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" *O Centro, supra* at 979 (quoting *SCF ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991)). Determining whether an injunction is mandatory or prohibitory can be "vexing." *Schrier v. University of Colo., supra* at 1260.

In this case, relying on decisions issued by other Judges in this District, Plaintiffs argue the last peaceable status quo was that which existed upon termination of the franchise and license agreements and, therefore, the injunction they seek is not a "disfavored" type. Not surprisingly, Defendants contend the status quo was that which existed just prior to those terminations and, therefore, the heightened standard applies.

The Court believes the heightened standard utilized in this Circuit applies in this case. Unlike some other cases referenced by the parties in argument, this is not a case where the occurrence giving rise to the right to termination is uncontested. Here, the parties dispute the occurrence of the necessary conditions as well as the overall "wrongfulness" of termination. In the Court's view, the last *peaceable* status quo between the parties was pre-termination at the latest. And Plaintiffs seek to alter that status quo. The injunction sought may be disfavored on other grounds as well. However, despite the Court's belief that this is a matter in which a

disfavored injunction is sought, the Court ultimately need not decide this question because Plaintiffs have met the burden of the heightened standard in this case, and therefore, by necessity, have met their burden under the ordinary standard as well.

**B.     Substantial Likelihood of Success on the Merits.**

*i.     The Franchise Agreements, License Agreements and ADA were Properly Terminated.*

As a threshold matter, Plaintiffs' effort to establish a substantial likelihood of success on the merits at trial on their claims is made easier or potentially more difficult depending upon the resolution of a question which does not appear to be fully developed in this Circuit – whether Plaintiffs must prove that the conditions giving rise to the right to terminate the agreements occurred or whether Plaintiffs are entitled simply to rely upon their act of termination without establishing the contractual conditions precedent to the exercise of such power. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998).[3]  Some cases may be read, and certainly interpreted by Plaintiffs, so as not to require analysis of the occurrence of the conditions giving rise to the right to exercise the power of termination. *See Big O Tires, LLC v. JDV, LLC*, Civil Action No. 08-cv-1046-WYD, 2008 WL 4787619 (D. Colo. Oct. 31, 2008); *Burger King Corp. v. Majeed*, 805 F.Supp. 994 (S.D. Fla. 1992).  In this view of the law, matters of the propriety of a termination are simply money damages issues which may be later argued at trial but which cannot defeat a request for injunctive relief by the franchisor following the exercise of the power of termination.  This Court does not subscribe to such an interpretation of the law and instead finds that, absent a proper termination of the instrument which grants the franchisee the

---

[3] This Court agrees with the Eleventh Circuit's finding that a franchisor much show it properly terminated the contract which authorized the use of the trademarks but does not necessarily adopt the Eleventh Circuit's finding, in a footnote, that the franchisees' requested injunction fell into the category of prohibitory and not mandatory injunctions. *McDonald's Corp. v. Robertson, supra* at 1307 n.2.

right to use of a mark, the franchisee's continued use of the trademarks is not unauthorized. *See McDonald's Corp. v. Robertson, supra*. On the record before me, this Court finds Plaintiffs have met the required showing that they properly terminated the franchise agreements which, in turn, supports the termination of the license agreements. As to the ADA, there is simply no dispute as to the non-occurrence of the event giving rise to the right to terminate as a third franchise was not established by the requisite date.

Section 4.1(C) of the franchise agreements expressly provides that Franchisees were required to adhere to (not "deviate from") Steak n Shake's standards and specification for selling food, including prices and mandatory promotions. *See also, e.g.*, Sections 5.1(F) (requiring franchisees to "fully participate" in promotional programs) & 7.1 (franchisor with sole and exclusive right to print menus and franchisee may not do so). Correspondingly, Section 11.1(A)(iii) states Franchisees are "deemed to be in default" and SNS Enterprises may terminate the franchise agreements (without opportunity to cure) effective immediately upon written notice of such terminations if the "Franchise knowingly sells products for a price in excess of any maximum prices established by Franchisor … or knowingly fails to offer a mandatory promotion."

Plaintiffs have provided more than substantial evidence demonstrating that, among other things, they set prices for meals in their traditional and $4 menu; they instituted the 2013 summer promotion of which Franchisees had actual acknowledge; the promotion was mandatory and required Franchisees to provide customers with the authorized $4 menu and display other marketing materials supporting the promotion; Franchisees received the promotional materials, including the authorized $4 menus; Franchisees were not using the marketing materials for the

summer promotion, such as the $4 menu extender at the drive-thru; Franchisees altered both the

traditional and $4 menu by printing copies of such menus and increasing the prices for meals

offered on those menus; Franchisees altered the price for the Bleu Ribbon Steakburger meal;

Franchisees sold meals at other than menu prices by substituting a la carte prices for meal prices

which, in the case of the $4 menu, caused $3.99 meals to be sold for $5.08; Franchisees offered

their customers the altered "$4 menu," the altered traditional menu, and the altered pricing for

the Bleu Ribbon Steakburger meal until SNS Enterprises disabled the a la carte function on the

POS system, thereby precluding Franchisees from ringing up the meals at higher than true menu

prices; even thereafter, Franchisees manipulated the authorized drive-thru menu by removing

from customers the right to purchase a small drink; and Franchisees only "offered" the

authorized $4 menu to a customer if that customer knew of and asked for such menu.  Plaintiffs'

evidence would also support a finding that Franchisees' actions were done "knowingly." [4]

Defendants contend they did not exceed the maximum prices established by Steak n

Shake because none of the items sold by them were priced in excess of that allowed by SNS

Enterprises for selling such items a la carte.  Defendants' argument misses the mark.  Plaintiffs

assert Defendants were in default *because* Defendants sold the meals as a la carte items rather

than as meals, thereby charging customers prices for the meals higher than advertised or as

allowed.

Defendants also argue Franchisees complied with the new $4 meal promotion because

they offered the new $4 menus to those customers who requested them.  This argument is

specious.  Providing a customer with a $4 menu only upon request did not fulfill Franchisees'

---

[4] The Court recognizes that, according to Defendants, they increased their prices and undertook other actions to enable the businesses to become profitable.  That motive does not alter the terms of the franchise agreements or authorize Defendants to breach their terms.

obligation to participate in the 2013 summer promotion.  It is rank resistance to the promotion

hiding behind a mask of linguistic cooperation.  It simply cannot be fairly said that Franchisees

offered the $4 menu to customers by opting to offer it only on their terms and only to those

customers fortunate enough to have heard about the promotion through means other than through

Plaintiffs.  Defendants' apparent belief that they alone – not Steak n Shake – are entitled to

determine what "maximum prices" and "offer" truly mean is incorrect.  Accordingly, Plaintiffs'

evidence strongly shows a substantial likelihood that they will prevail in establishing Franchisees

breached the franchise agreements.

     *ii.*       *The Termination Survives the Defects in the June 18, 2013 Letter.*

     There is, however, a complication.  Plaintiffs' June 18, 2013 letter "offered" Franchisees

an opportunity to cure these breaches.  The questions raised are what is the effect of such an

"offer" and whether, in light of the making of such "offer," Plaintiffs' July 3, 2013 termination

notice was nonetheless effective.

     The June 18, 2013 letter claims Franchisees breached the franchise agreements in four

instances: (1) failing to offer the $4 menu; (2) printing menus without SNS Enterprises' consent;

(3) altering of marketing materials; and (4) charging prices higher than SNS Enterprises'

published menu prices.  Items numbered (1) and (4) fall within the Immediate Termination

category for which no notice of default or opportunity to cure was required.  The other two

items, however, fall within the 30-Day Termination category.

     Plaintiffs contend the June 18, 2013 letter was simply an offer while Defendants argue it

was a notice of default required by the franchise agreements.  For Immediate Termination

breaches, there is no pre-termination notice of default required by the franchise agreements.  As

to those breaches, if the letter was an offer, it was a gratuitous offer for which no consideration has been shown or an extracontractual offer which Defendants were free to accept or reject. Defendants, however, failed to accept (*i.e.*, comply with its terms) within the time afforded as shown by Mr. Whitney's testimony that on June 21, 2013, he could not find the $4 menu in the restaurants and Franchisees were providing the $4 menu only if requested.  If, as to the Immediate Termination breaches, the letter was a notice of *default*, it too was gratuitous or extracontractual as none was required; therefore, it was of no legal significance in determining whether a proper notice of *termination* was subsequently given for Immediate Termination breaches.

For 30-Day Termination breaches, the evidence shows the June 18, 2013 letter was defective in that it was e-mailed as opposed to delivered personally or through an overnight service as required by Section 14.1; it was, arguably, defective because it was sent to Franchisees' attorney as opposed to Franchisees themselves as required under Section 14.1; and it did not give Franchisees the benefit of the full 30-day cure period.  But that is of no moment. These defects may prevent proper termination based on defaults falling within the 30-Day Termination category which required specific types of notice.  But the franchise agreements were terminated on other, wholly valid bases as well – those within the Immediate Termination category where no notice of any type as to defaults was required.  The franchise agreements allowed SNS Enterprises to terminate for a number of reasons and any failure to comply with notice requirements as to one breach does not invalidate any otherwise valid notice given or action taken for another breach.

Franchisees argue the June 18, 2013 offer/notice was improper because it placed conditions not required under the terms of the franchise agreements.  Specifically, they argue: (1) there was no requirement for Franchisees to offer the $4 menu "to all guests and at all times"; (2) Section 5.1(D) precluded SNS Enterprises from requiring Franchisees to bear the sole cost of a mystery shopper program; and (3) there was no requirement to pay SNS Enterprises' travel expenses to conduct a follow-up inspection.  The Court is not persuaded by the first argument but agrees Section 5.1(D), upon which SNS Enterprises relied, required Franchisees to only pay their "proportionate share" of the costs of the program and the requirement to pay for the requested travel expenses has not been shown.  It is unclear whether Franchisees contend these latter requirements are unenforceable or render the entire June 18, 2013 offer/notice ineffectual.  Either result, however, would not affect the validity of the July 3, 2013 notice of termination based on Franchisees "intentional deviation from Franchisor's menu prices."

Similarly, effective notices of termination were given for the license agreements and ADA.  Section 2.2(c) of the license agreements provides that all rights granted thereunder terminate automatically without notice if Franchisees are in default under Article 11 of the franchise agreements beyond the cure period, if any.  Plaintiffs' July 3, 2013 letter notified Franchisees of this fact and the license agreements' termination.  Control was in default under the ADA when it did not open the third restaurant by June 2, 2013.  SNS Enterprise also properly provided notice to Control of the ADA's immediate termination.  Accordingly, Plaintiffs have shown they have met the threshold requirement that the terminations of the three agreements were proper.

*iii.*      ***Trademark Infringement and Unfair Competition.***

In order to prevail on Plaintiffs' trademark infringement claim under Section 32 of the Lanham Act, they must show Defendants used SNS's Marks in commerce without its consent and that such unauthorized use was likely to cause confusion in the marketplace.  15 U.S.C. § 1114(1); *see Beltronics USA, Inc. v. Midwest Inv. Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009).  The central inquiry is the likelihood of consumer confusion.  *Beltronics USA, Inc. v. Midwest Inv. Distrib., supra.*  This same inquiry applies to Plaintiffs' unfair competition claim under Section 43(a) of the Lanham Act.  *See* 1 Charles D. McKenney & George F. Long III, Federal Unfair Competition: Lanham Act 43a § 3.8 (2013).

It is well established that a terminated franchisee's continued use of the former franchisor's trademarks is likely to cause consumer confusion and constitutes trademark infringement.  *See, e.g.*, 4 J. Thomas McCarthy, Trademarks and Unfair Competition § 25:31 (4th ed. Updated 2013); *Winmark v. Schneeberger*, Civil Action No. 13-cv-0274-WJM-BNB, 2013 WL 1154506, at *5 (D. Colo. March 19, 2013).  "A licensee who once had authorization becomes associated in the public mind with the licensor or franchisor.  When such a party loses authorization but continues use of the mark, the potential for consumer confusion is greater than in the case of the random infringer."  4 J. Thomas McCarthy, Trademarks and Unfair Competition § 25:31 (4th ed. Updated 2013).  *See also Winmark v. Schneeberger, supra* at *5.

As discussed above, Plaintiffs have met their burden of showing lawful terminations of the franchise and license agreements as of July 3, 2013.  Franchisees' use of the Marks was unauthorized from that date forward, but it is undisputed they continued thereafter to use the Marks and to hold themselves out to the public as Steak n Shake restaurants.  Indeed, even now –

admittedly aided for a time by the TRO – Franchisees continue to operate as if they were Steak n

Shake restaurants.  Plaintiffs produced evidence that even post-termination they received various

forms of customer complaints about the restaurants (even pre-TRO) which establishes that

customer confusion was not a theory, but a fact.  Such evidence is sufficient for Plaintiffs to

establish a strong likelihood of success on the merits of their Lanham Act claims.

### iv.     Breach of Contract and Guaranty Claims.

Plaintiffs' breach of contract and guaranty claims are based on Defendants' alleged

failure to perform post-termination obligations under the franchise and license agreements.  (AC,

¶¶ 57-67.)  While direct references to the ADA are sparse, Plaintiffs' Amended Complaint does

allege the termination of the ADA and a breach of Control's post-termination obligations.

Further, Plaintiffs' Motion for PI also seeks to enforce such post-termination obligations against

Control based on the undisputed termination of the ADA as addressed during the evidentiary

hearing.

As to the franchise agreements, the post-termination obligations may be divided into two

types.  First, obligations which require Franchisees to cease operating as Steak n Shake

restaurants by, for example, de-identifying the restaurants as such and stopping any use of the

Marks and proprietary and confidential information.  Second, obligations which require

Franchisees to cease having any interest for two years in a "Competing Business" located at or

within five miles of the "Authorized Location" or any then-existing Steak n Shake or Steak n

Shake Signature Restaurant, as those terms are defined in the franchise agreements.  A

"Competing Business" includes those which derive 25% of their business from the sale of

ground beef sandwiches or which offer both ground beef sandwiches and ice cream products.

The "Authorized Locations" are those developed under the franchise agreements.  (Exs. 10 & 12, §§ 1.1(C), 1.1 (F) & 12.2; Ex. B-1 to Exs. 10 & 12.)

Similar to the franchise agreements, upon the termination of the ADA, Control no longer has any rights with respect to Shake n Steak and may no longer develop or operate Steak n Shake restaurants.  Moreover, Control is prohibited from identifying itself as a franchisee or former franchisee and having any interest in any "Competing Business" in the "Development Area" (generally, the greater Denver metropolitan area) for a period of two years.  "Competing Business" is defined in the same manner as that under the franchise agreements.

Guarantors have agreed, by their covenants in connection with the ADA and franchise agreements, to guarantee the performance of Franchisees' post-termination obligations and have personally entered into non-compete covenants.  These covenants mirror those set forth in the ADA and franchise agreements.

Under the license agreements, upon their termination, Franchisees are required to immediately and permanently cease any and all use of the Marks, or any simulation thereof.  No separate guarantees were required of Guarantors.

The evidence established Control "developed" the two franchised restaurants operated by Franchisees and that Franchisees continue to operate as Steak n Shake restaurants – and to use the Marks – in the "Authorized Locations" after the July 3, 2013 termination notice.   Both the proper termination of the various agreements and the post-termination operation of  Franchisees' restaurants as Steak n Shake restaurants triggered the post-termination obligations of the various Defendants.  Such evidence shows Plaintiffs have a substantial likelihood of success on the merits of their breach of post-termination covenant claims.

As to the more focused claims of breach of the various covenants not to compete, the Court finds Plaintiffs have shown a substantial likelihood of success on the merits of these claims as well. There is a rule of reasonableness that applies to both duration and geographic scope of such covenants. *See National Graphics Co. v. Dilley*, 681 P.2d 546 (Colo. App. 1984); *McCart v. H & R Block, Inc.*, 470 N.E. 2d 756 (Ind. App. 1984). Here, the covenants are properly limited and reasonable both as to scope and duration. As to Franchisees and their Guarantors, they are limited from operating a Competing Business (as defined in the franchise agreements) only within five miles of an existing Steak n Shake or within five miles of the Authorized Locations . As to Control and its Guarantors, the geographic limitation is confined to the Development Area (as defined by the ADA) and is, again, applicable only for two years. As to each covenant, the Court concludes that Plaintiffs have a legitimate interest in the covenants as a means of protecting themselves from unfair competition from Defendants under all of the circumstances. I find that Plaintiffs have demonstrated a likelihood of success on the merits as to the covenants not to compete.

### C.       Irreparable Injury.

"'To constitute irreparable harm, an injury must be certain, great, actual and not theoretical.'" *Schrier v. University of Colo., supra* at 1267 (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). The injury complained of must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm. *Id.* Simple economic losses usually do not constitute irreparable harm as such losses are compensable by monetary damages. *Id.* Factors which support irreparable harm determinations include inability to calculate damages; harm to goodwill; diminishment of competitive positions

24

in marketplace; and lost opportunities to distribute unique products. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004).

### i.      Trademark Infringement and Unfair Competition.

Plaintiffs argue that when a defendant commits a trademark infringement, irreparable harm to the plaintiff is presumed.  The U.S. Supreme Court in *eBay v. MercExchange, LLC,* 547 U.S. 388, 393-394 (2006) has, however, called into question whether such a presumption should be applied.  Regardless, the Court has examined the evidence and determined that, even in the absence of such a presumption, Plaintiffs have clearly met their burden.

As previously stated, the evidence shows that, after the July 3, 2013 termination notice, Franchisees are continuing to operate as Steak n Shake restaurants at the same locations and using Plaintiffs' brand.  This creates a likelihood of confusion for customers who patronize the restaurants and harms Plaintiffs' goodwill.  As evidenced by Franchisees' disregard for Plaintiffs' publicized promotion and authorized pricing during the term of the franchise agreements, Franchisees' restaurants will undoubtedly operate differently from true Steak n Shake restaurants.  Plaintiffs will have no control over those operations.  Plaintiffs' reputation is endangered by Franchisees' use of Plaintiffs' brand.

### ii.      Breach of Contract and Guaranty Claims.

As previous discussed, the post-termination obligations include requiring Defendants to cease operating as Steak n Shake restaurants (and using the Marks) and/or to cease competing as similar restaurants at those Centennial and Sheridan locations.  For the same reasons which support irreparable harm from the Lanham Act claims, Plaintiffs have sufficiently shown they

will suffer irreparable harm if Defendants are allowed to continue to operate as Steak n Shake restaurants.

Plaintiffs have not, however, shown there will be certain or actual irreparable harm if, until trial on the merits, Defendants are allowed to continue operating a Competing Business within five miles of the Authorized Locations or the Development Area where such restaurants are stripped of any markings or associations with Plaintiffs or the Steak n Shake brand.  Plaintiffs again rely on a presumption of irreparable harm.

Certainly, Defendants have had access to Steak n Shake's confidential and propriety systems, trade secrets, non-public information, and marketing policies such that Defendants would have an unfair advantage if allowed to compete directly with authentic Steak n Shake restaurants within a particular geographic area.  But within the entire state of Colorado, there is only a single Steak n Shake restaurant in Colorado Springs which remains following termination of Franchisees' restaurants.  Accordingly, the Court finds Plaintiffs have made a strong showing of irreparable harm, and therefore do not need to rely on a presumption, only as it pertains to any Competing Business Defendants might operate within five miles of the Steak n Shake restaurant in Colorado Springs or other existing Steak n Shake restaurant outside of Colorado.

As to the operation of a Competing Business within five miles of the Authorized Locations or Development Area, the adequacy of the showing is wanting.  As noted, there are no other Steak n Shake restaurants in the Denver metropolitan area.  No evidence has been presented showing that Steak n Shake plans to resume or continue expansion into the Denver metropolitan area, much less in the Authorized Locations, before a trial on the merits.  No evidence has been presented which explains how allowing Defendants to operate, or have an

interest in, as the case may be, a Competing Business in the Authorized Locations or

Development Area until trial causes anything other than theoretical harm to Plaintiffs at this

time.  Rather, as noted, harm is simply being presumed.  However, on the facts presently before

this Court, such a presumption is unwarranted and should not automatically be applied.  At most,

at this time, any harm caused by having Defendants operate (or have an interest in) a Competing

Business at or within five miles of the Authorized Locations or the Development Area between

now and trial is strictly theoretical.  And to that extent, prevention of such theoretical harm will

not be prevented by injunctive relief.[5] [6]

### D.    Balance of Harm.

This factor requires the threatened injury to Plaintiffs to outweigh the harm caused to the

opposing party as a result of the injunction.  As this Court has found that, on the record before it,

Plaintiffs have shown no irreparable harm in allowing Defendants to continue to operate

Competing Businesses in the Authorized Locations or Development Area, no further discussion

is required as to this aspect of the non-compete obligation.  Plaintiffs are, however, entitled to

have the non-compete obligations enforced within five miles of the Colorado Springs restaurant

and of any existing Steak n Shake restaurant outside of Colorado.  And, Plaintiffs have produced

sufficient evidence that if an injunction is not entered with respect to the use of the Marks by the

terminated Franchisees, Plaintiffs will be irreparably harmed by customer confusion and the

---

[5] Here, it is at least possible that application of the heightened standard for preliminary injunctive relief might deny Plaintiffs relief which would otherwise be available under the traditional or "non-heightened" standard.  The Court has considered that possibility and determined that its conclusion as to the Authorized Locations and Development Area would be the same under the lesser standard.

[6] There is also a problem with respect to Guarantors' agreement not to operate within the Development Area. Although this matter has been discussed in the papers and evidence presented, the Amended Complaint contains no claim for relief predicated on this specific guarantee.

potential loss of goodwill through Franchisees' continued operation as seemingly authentic Steak

n Shake restaurants.

On the other hand, if injunctive relief is entered there will indeed be some harm to

Defendants.  Viewed collectively, Defendants will no longer be able to operate as Steak n Shake

restaurants and benefit from the goodwill associated with such restaurants or the use of

Plaintiffs' proprietary information.  Contrary to Defendants' contention, the evidence now before

the Court does not show that any harm to them will be certain, great or not compensable in

damages.  The harm which this Court found in granting Defendants' Renewed Motion was

premised on Defendants' inability to operate *rightfully as* Steak n Shake restaurants where the

proprietary goods and services which served as a foundation for being Steak n Shake restaurants

were being withheld.  Such facts and circumstances no longer exist.  And, at this time, the Court

will not enjoin Defendants from operating (or having an interest in) Competing Businesses

(except within five miles of the Colorado Springs restaurant or other Steak n Shake restaurants

outside of Colorado for a period of two years) so Defendants are not precluded from retaining

their employees and purchasing goods and services from vendors other than those approved by

Steak n Shake.

On balance, the Court finds the threatened injury to Plaintiffs strongly outweighs the

harm caused to Defendants should an injunction be entered.  Accordingly, Plaintiffs have

sustained their burden in establishing this prong for injunctive relief, except as noted.

### E.    Public Interest.

This factor also weighs heavily in favor of Plaintiffs.  As previously stated, the

unauthorized use of the Steak n Shake brand by Defendants will likely, if not certainly, cause

customer confusion of the very sort the Lanham Act seeks to prevent.  There is all but the certain

risk that consumers will believe the terminated franchises are still authorized franchises and

adhere to the same standards of an authorized Steak n Shake.  Concomitantly, the public interest

in allowing Defendants to continue to provide employment for Coloradans is not foreclosed as

Defendants are not precluded from operating non-Steak n Shake restaurants.  Accordingly, all

things considered, the issuance of the injunction would not be adverse to the public interest.

### F.        Surety.

The Court will require a surety bond in this matter.  At the conclusion of the August 23,

2013, evidentiary hearing, the Court sought the input of all parties as to the proper amount of

such bond should an injunction issue.  Not surprisingly, the views of the parties were

incompatible with each other.  Both sides suggested that a substantial bond would be appropriate.

Plaintiffs defined such a bond as in the range of $50,000 to $75,000.  Defendants defined such a

bond as being $5,000,000.  Neither side offered anything by way of background for its figures.

The Court deems Defendants' suggestion to be prohibitive and designed to prevent the

issuance of an injunction even if one should be ordered.  I find Plaintiffs' suggestion to be both

substantial and reasonable, particularly given Plaintiffs' strong showing as to the necessity for

granting the requested relief and Defendants' testimony that the restaurants are in fact losing

money.  Finally, while in no way binding upon or determinative of the Court's decision, I find

that a bond in the neighborhood of that suggested by Plaintiffs is more than consistent with the

pre-termination expectation of the parties in light of Section 15.1 of the franchise agreements

which provide that in the event the franchisor shall be required to seek preliminary injunctive

relief, "Franchisor may seek … preliminary injunctive relief without bond."

### III.  CONCLUSION

As required by the heightened standard which the Court has determined is appropriate in this case, the Court has closely scrutinized Plaintiffs' requests for injunctive relief to assure itself that the exigencies of this case require extraordinary interim relief.  The Court finds and concludes that each of the factors applicable to the issuance of a preliminary injunction tips strongly in favor of Plaintiffs.  Accordingly, this Court **GRANTS** Plaintiffs' request for preliminary injunction to the extent stated herein.  The Court hereby **ORDERS** as follows:

1.      Franchisees are **ORDERED** immediately to cease and desist from operating the restaurants located at 8271 S. Quebec St., Centennial, Colorado and 3502 River Point Parkway, Sheridan, Colorado (collectively, "Restaurants") as Steak n Shake restaurants;

2.      Franchisees are **ORDERED** immediately to cease and desist from holding the Restaurants out as Steak n Shake restaurants and/or franchisees or former franchisees;

3.      Franchisees are **ORDERED** immediately to cease and desist from using the Marks, or any simulation thereof, inside and outside of or in connection with the Restaurants;

4.      Franchisees are **ORDERED** immediately to de-identify the Restaurants as Steak n Shake restaurants by, including, but not limiting, removing all menus, advertising, signs, emblems, and displays identifying the Restaurants as being associated with Steak n Shake; and changing the color scheme, interior and exterior design, and décor so as to distinguish the Restaurants from other Steak n Shake restaurants;

5.      Franchisees are **ORDERED** immediately to cease and desist from using any confidential or proprietary information belonging to Plaintiffs and to return any and all documentation of the same to Plaintiffs;

6.      Franchisees are **ORDERED** immediately to relinquish Franchisees' Steak n Shake telephone numbers and web addresses and designs and assign the same to Plaintiffs;

7.      Franchisees and Guarantors are **ORDERED** immediately to abide by the non-compete clauses of Section 12.2 of the terminated franchise agreements and Section 3 of the personal guarantees, but only insofar as the same shall pertain to the Colorado Springs Steak n Shake restaurant or other currently existing Steak n Shake restaurants outside of Colorado;

8.      To the extent not otherwise ordered or inconsistent with that ordered in paragraphs 1-7 above, Franchisees are **ORDERED** immediately to comply with all obligations imposed on them under Sections 11.2(B), (C) & (D) and 11.3(A) & (C) of the franchise agreements;

9.      To the extent Franchisees shall fail to comply with their obligations under the franchise agreements as ordered herein, Guarantors are **ORDERED** immediately to comply with all obligations imposed by Section 6(b) of the Personal Guaranty and Personal Covenants by Principal Owners, Appendix B-1 to the franchise agreements;

10.      Control is **ORDERED** immediately to comply with the requirement to de-identify itself as a franchisee of the System as set forth in Section 7.07 of the ADA;

11.     Plaintiffs' Motion for Preliminary Injunction (ECF No. 11) is **GRANTED** to the extent set forth herein;

12.     The TRO issued by this Court on August 14, 2013, has expired by its own terms and is no longer of any force or effect;

13.     The parties are **ORDERED** to file with the Court, within 45 days after the posting of the surety bond described below, a report as to the compliance with the terms of this Order and any disputes which are outstanding with regards thereto;

14.     Plaintiffs are **ORDERED** to post a surety bond with the Clerk of the Court in the amount of $50,000.00 in order to secure the payment of any costs and damages that may be sustained by any party found to have been wrongfully restrained or enjoined.  This Order will be effective when Plaintiffs post their surety bond; and

15.     Plaintiffs may file a motion for modification of the scope or terms of the relief granted herein if circumstances develop which would justify issuance of relief presently denied herein.

 DATED this 3rd day of September, 2013.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge

# EXHIBIT 1

# NEW! $4 FOOTLONG MEALS

Grilled Footlong Hot Dogs – 1/4 lb. 100% Beef with Cuts of Sirloin Steak



## CLASSIC

Grilled Footlong topped with mustard – simply delicious! Served with fries.  **3.99**

## ALL AMERICAN

Grilled to perfection and topped with mustard, ketchup, sweet pickle relish and diced onions – better than the ball park! Served with fries.  **3.99**





## CHICAGO-STYLE

Classic Chicago-style Footlong with all the traditional toppings – mustard, diced onions, sweet pickle relish, tomato slices, pickle and sport peppers on a poppy seed bun. Served with fries.  **3.99**

## CHILI CHEESE

Grilled to perfection and topped with our slow-simmered Genuine Chili, shredded Cheddar 'n jack cheese, and diced onions. Served with fries.  **3.99**



# NEW! SPECIALTY MEALS

## CHILI 3-WAY

Spaghetti topped with our slow-simmered Genuine Chili, extra chili beef, and our special chili sauce.  **3.99**



## TACO SALAD

Enjoy the flavors of the Southwest! We begin with our Steakburger™ beef, expertly seasoned and served over crispy lettuce with diced tomato, shredded cheese, crispy tortilla strips, and Ranch dressing.  **3.99**



## STEAKBURGER SHOOTERS®

Mini Steakburgers, made with 100% Beef. Choose either Garlic, Nacho Cheese, or Hot Pepper.  3 Shooters 'n Fries.  **3.99**





## NEW! SEASONED FRIES

**ADD 29¢ TO ANY SANDWICH 'N FRIES**

• Parmesan Cheese 'n Herbs • Salt 'n Vinegar
• Sea Salt 'n Cracked Pepper

# EXHIBIT 2





4

# EXHIBIT 3

THIN 'N CRISPY **FRIES** | MADE FRESH | **MADE WITH 100% REAL BEEF** | FAMOUS FOR **STEAKBURGERS** **CHERRY** TOP | CLASSIC FLAVORS

# HAND-DIPPED MILK SHAKES



**NEW!** SPECIALTY STEAKBURGER™ MEALS

Hand-crafted from 100% beef, including steak and quick-seared on our fiery hot grill to seal in the flavor and create our unique crispy edges. Served on a toasted bun.

## GARLIC DOUBLE STEAKBURGER™

If you love buttery garlic bread, this one's for you! Our Double Steakburger™ is topped with melted American cheese and served on a toasty bun with garlic butter spread and a sprinkle of garlic salt on top. Served with fries. **3.99**

## GUACAMOLE SINGLE STEAKBURGER™

A Single Steakburger™ topped with pepperjack cheese and our delicious, fresh guacamole, made from scratch daily! Served with fries. **3.99**

## JAMAICAN JERK DOUBLE STEAKBURGER™

Experience the quintessential taste of Jamaica on our Double Steakburger™ with pepperjack cheese, onions and authentic Jamaican Jerk sauce. Served with fries. **3.99**

## PRINCE OF ROYALE STEAKBURGER™

A similar version of our popular Royale Steakburger®! A Single Steakburger™ with melted American cheese and hickory-smoked bacon topped with a delicious fried egg. Served with fries. **3.99**

## THREE PEPPER DOUBLE STEAKBURGER™

A Double Steakburger™ topped with pepperjack cheese, zesty banana pepper rings and spicy Jalapeño ketchup. Served with fries. **3.99**

## NACHO CHEESE DOUBLE STEAKBURGER™

Crispy red tortilla strips, jalapeño slices and nacho cheese sauce on our Double Steakburger™ - Olé! Served with fries. **3.99**

## BACON HORSERADISH SINGLE STEAKBURGER™

A Single Steakburger™ for the steak lover! Topped with melted American cheese, crispy bacon, French's French Fried Onions and zesty horseradish sauce. Served with fries. **3.99**

# EXHIBIT 4

```
*313616*
```

## Steak 'n Shake No:5305302

TBL   30 PTY   1
Name: Clayton C   5/16/2013   7:16:33 PM
SEAT:   1
    1 Chicago Frank                    2.99
    1 Small Fries                      1.79
    1 Bottled Water                    1.79
        Tax:    0.58        Total:     7.15


SEAT:  2
**TO GO**
    1 Dbl Stkbrg Jerk                  3.29
**TO GO**
    1 Small Fries                      1.79
        Tax:    0.45        Total:     5.53


                    SubTotal          11.65
                    State Tax          0.91
                    PIF                0.12

                    Total            12.68


***********************************

************************************
1/2 Price Happy Hour!!!

/3

# EXHIBIT 5



**CRISPY FRIES** · MADE FRESH · **100% REAL BEEF** · **STEAKBURGERS CHERRY TOP**

# HAND-DIPPED MILK SHAKES

## NEW! SPECIALTY STEAKBURGER MEALS

Hand-crafted from 100% beef, including steak and quick-seared on our fiery hot grill to create our unique crispy edges. Served on a toasted bun.

### GARLIC DOUBLE STEAKBURGER™

If you love buttery garlic bread, this one's for you! Our Double Steakburger™ is topped with melted American cheese and served on a toasty bun with garlic butter spread and a sprinkle of garlic salt on top.
Served with fries. 5.08



### GUACAMOLE SINGLE STEAKBURGER™

A Single Steakburger™ topped with pepperjack cheese and our delicious, fresh guacamole, made from scratch daily!
Served with fries. 5.08



### JAMAICAN JERK DOUBLE STEAKBURGER™

Experience the quintessential taste of Jamaica on our Double Steakburger™ with pepperjack cheese, onions and authentic Jamaica
Served with fries. 5.08



### PRINCE OF ROYALE STEAKBURGER™

A similar version of our popular Royale Steakburger®! A Single Steakburger™ with melted American cheese and hickory-smoked bacon topped with a delicious fried egg.
Served with fries. 5.08



### THREE PEPPER DOUBLE STEAKBURGER™

A Double Steakburger™ topped with pepperjack cheese, zesty banana pepper rings and spicy Jalapeño ketchup.
Served with fries. 5.08



### NACHO CHEESE DOUBLE STEAKBURGER™

Crispy red tortilla strips, jalapeño slices and nacho cheese sauce on our Double Steakburger™. Olé!
Served with fries. 5.08



### BACON HORSERADISH SINGLE STEAKBURGER™

A Single Steakburger™ for the steak lover! Topped with melted American cheese, crispy bacon, French's French Fried Onions and zesty horseradish sauce.
Served with fries. 5.08



## NEW! SEASONED FRIES

**ADD 29¢ TO ANY SANDWICH 'N FRIES**
• Parmesan Cheese 'n Herbs • Salt 'n Vinegar
• Sea Salt 'n Cracked Pepper

3