**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No.  13-cv-01751-RM-CBS

STEAK N SHAKE ENTERPRISES, INC., and
STEAK N SHAKE, LLC,

      Plaintiffs,


v.

GLOBEX COMPANY, LLC,
SPRINGFIELD DOWNS, INC.,
CHRISTOPHER BAERNS,
LARRY BAERNS,
KATHRYN BAERNS, and
CONTROL, LLC,

      Defendants.

---

## ORDER

---

THIS MATTER is before the Court on Plaintiffs' Motion for Summary Judgment (the "Motion") (ECF No. 81), seeking judgment in their favor on all claims and counterclaims filed in this case arising from the termination of  franchise, license, and area development agreements related to two Steak n Shake restaurants operated by Defendants Globex Company, LLC and Springfield Downs, LLC.[1]  Exercising subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 1367, after consideration of the Motion, Response, Reply, the court file, and the applicable statutes, rules and case law, and for the reasons stated herein, the Court grants

---

[1] Each of these two defendants operated one Steak n Shake restaurant.

Plaintiffs' Motion, vacates the trial date, and sets a status conference for 1:00 p.m. on Thursday, July 16, 2015.

## I.     PROCEDURAL HISTORY

Plaintiffs Steak n Shake Enterprises, Inc. and Steak n Shake, LLC (collectively, "Plaintiffs" or "Steak n Shake") filed this action seeking injunctive relief and damages arising from the termination of: (A) written franchise and license agreements between Steak n Shake Enterprises, Inc., as franchisor, and Steak n Shake, LLC, as licensor, and Defendants Globex Company, LLC and Springfield Downs, LLC (collectively, "Franchisees"), and their individual guarantors Defendants Christopher Baerns, Larry Baerns, Kathryn Baerns (collectively, "Guarantors" or the "Baerns"); and (B) a written area development agreement between Steak n Shake Enterprises, Inc. and Defendant Control, LLC.  (ECF No. 10.)  In their Amended Complaint, Plaintiffs asserted the following five claims for relief: (1) Count I – Trademark Infringement under 15 U.S.C. § 1114(1); (2) Count II – Unfair Competition under 15 U.S.C. § 1125(a); (3) Count III – Breach of Contract – Specific Performance; (4) Count IV – Breach of Contract – Damages; and (5) Count V – Breach of Guaranty – Damages.  Defendants, in response, filed eight counterclaims: (1) Count I - Declaratory Judgment – Franchise and License Agreements; (2) Count II – Injunctive Relief; (3) Count III – Breach of Contract – Franchise and License Agreements; (4) Count IV – Breach of Duty of Good Faith and Fair Dealing; (5) Count V – Breach of Contract – Area Development Agreement; (6) Count VI – Fraud; (7) Count VII – Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq.*; and (8) Count VIII – Intentional Interference with Prospective Economic Advantage.

2

By Order ("Order") dated September 3, 2013, based on the evidence and arguments then before the Court after an evidentiary hearing, the Court granted in part and denied in part Plaintiffs' Motion for Preliminary Injunction. (ECF No. 48.) After conducting discovery, Plaintiffs moved for summary judgment on all claims and counterclaims. In their Response, Defendants withdrew their claim based on the Colorado Consumer Protection Act (Count VII). (ECF No. 87, page 15.) In addition, in the Final Pretrial Order, Defendants represented their claim for injunctive relief (Count II) is moot in light of the Order granting Plaintiffs injunctive relief. (ECF No. 94, p. 9 n.1.) Accordingly, those counterclaims are no longer at issue.

## II.   FACTUAL BACKGROUND

### A.   Defendants Become Steak n Shake Franchisees

Steak n Shake is a brand of restaurants franchised by Plaintiffs.[2] Defendant Kathryn Baerns ("Mrs. Baerns") had fond childhood memories of Steak n Shake and when the Baerns family decided to go into business, they decided on Steak n Shake. In applying to become franchisees, in about September 2011,[3] each of the Baerns submitted a "Request for Consideration" to Steak n Shake, representing they each had extensive experience in the food brokerage business and/or restaurant business. And, in connection with their application – and, ultimately, decision – to do business with Plaintiffs, Defendants were represented by counsel.

By December 2, 2011, Control, LLC entered into an Area Development Agreement ("ADA") with Plaintiffs to develop a stated number of franchised Steak n Shake restaurants. In about June 2012, Tom Caruso of COLO SS, LLC asked Defendants if they would be interested

---

[2] For ease of reference, Plaintiffs are generally referred to collectively even though, for example, the Franchise Agreements are between Steak n Shake Enterprises, Inc. and Franchisees. Similarly, Defendants are generally referred to herein collectively.
[3] Mrs. Bearns may have submitted her request earlier.

in purchasing his existing Steak n Shake restaurants located in Centennial and Sheridan, Colorado.  In September 2012, Franchisees acquired Mr. Caruso's existing franchised Steak n Shake restaurants in Centennial (a/k/a Store 5301) and Sheridan (a/k/a Store 5302).  In connection with the acquisition, the ADA was amended and, as amended, reflected that Control's obligation to develop the first two restaurants was satisfied by the acquisition of the Sheridan and Centennial restaurants.  In addition, Franchisees entered into franchise and license agreements (the "Franchise Agreements" and "License Agreements") with Plaintiffs for the operation of the existing Steak n Shake restaurants.  The Baerns personally guaranteed (the "Guaranties") each of Franchisees' obligations under their respective Franchise and License Agreements, and agreed to post-termination covenants not to compete.

Prior to entering into the ADA and License and Franchise Agreements, Defendants were aware that Plaintiffs offered a 4 Meals Under $4 promotion, where meals were priced at $3.99.

**B.  Steak n Shake's $4 Menu and the 2013 Summer Promotion, and the Letters of Default and Termination**

After their September 2012 acquisition of the existing restaurants from COLO SS Inc., Defendants began operating the two Steak n Shake restaurants.  On November 27, 2012, Mr. Baerns sent James Valentino, Plaintiffs' Vice President of Franchise Support, an email requesting Plaintiffs to consider price changes for certain food items in order to "increase profitability," to which Mr. Valentino did not respond.  In about January 2013, Plaintiffs increased the price of some Steak n Shake menu items, including some a la carte items, and Mr. Baerns decided to do the same – that is, to increase the price of certain menu items, but without Plaintiffs' authorization.  On January 24, 2013, Mr.  Baerns sent an email to, among others, Defendants Larry Baerns ("Baerns Sr.") and Mrs. Baerns, requesting their approval to send a

letter to Plaintiffs, outlining three proposals, the third of which was to ring up items a la carte, including meals which were to be sold as meals.  In response, Baerns Sr. stated: "Why in your opinion would we not be in violation of the franchise agreement if we implemented Proposal 3?" (ECF No. 90-7.)

By email dated January 27, 2013, Mr. Baerns wrote to Plaintiffs stating they had ignored him "for months" and that he had "submitted requests and proposals regarding pricing for several months, all of which have still not been responded to, to this day."  (ECF No. 88-11.)  In that email, Mr. Baerns advised Plaintiffs that Franchisees were, as of Monday, February 18, 2013, "going to effectively change our pricing, while keeping with the current pricing structure.  We will be training and implementing a new system, where all items will be rung up a la carte." (ECF No. 88-11.)

Defendants, however, apparently did not do so in February.  Instead, in about February through April 2013, Mr. Baerns was trying to determine how to raise prices and still utilize Plaintiffs' point of sale (POS) system.  Mr. Baerns sent several emails communicating possible options to, among others, Mark Clark, Defendants' Director of Operations.  Among the actions proposed by Mr. Baerns – and ultimately taken by Franchisees – were:

(1) at the restaurants' drive-thru, increase prices by changing the cup size of a large drink from a 44-ounce cup to a 28-ounce cup (regular cup size) and calling it a large.  Thus, at the drive-thru, every combo meal would be rung up with a large drink – adding $0.50 to each combo meal – but, unbeknownst to the guests, they would receive a regular size drink;

(2) in the dining room, charge a la carte pricing for under $4 meals, thereby increasing

the price of the under $4 meals from $3.99 to $5.08; and

(3) print new menus by modifying Steak n Shake's online under $4 menu to change its

price from $3.99 to $5.08 in anticipation of going a la carte pricing on the under $4

meals.

Franchisees took these actions without notifying Plaintiffs.  In fact, Mr. Baerns sent an e-mail,

about which Mr. Clark testified, stating:

> … May 1st is the date we decided to go live with this.  …
>
> ***
>
> … We will also be coming up with contingency plans, trying to anticipate any and
> all things that Steak 'n Shake may do to derail this.  Once we examine these and
> come up with plans, we will let you know.  Any suggestions or recommendations
> would be welcome.
>
> *The one thing that hasn't been quite decided yet is whether to let Steak 'n Shake*
> *know about it prior to going forward.*  We could let them know that it is going
> into place and give them 1 more chance to set up a tiered pricing structure.  The
> reason we may not let them know is in the hopes that it takes a month or more for
> them to notice, thus keeping the subsidy checks coming. …

(ECF No. 82-12 (emphasis added), No. 82-8.)  Mr. Clark did not ask Plaintiffs for approval

because he knew it would not be forthcoming.

Also on or about the same time period, Plaintiffs decided to roll out a new promotion (the

"Summer Promotion") that expanded the original 4 Meals Under $4 menu to include additional

meals to be offered for sale at $3.99, and that introduced the Bleu Ribbon Steakburger meal.  In

preparation for the roll out, on April 5, 2013, Plaintiffs held a franchisee call in to discuss the roll

out of the new $4 menu promotion and associated marketing materials.  Mr. Baerns participated

in that call.  Under the terms of the new $4 menu promotion, among other things, Defendants

were required to place $4 menu inserts into the regular menus from 11:00 a.m. to midnight, and midnight to 6:00 a.m.  (Summer 2013 Promotional Guide, ECF No. 82-5, SNS_007089.)

Defendants received marketing materials from Plaintiffs for the new $4 menu promotion but did not use them.  Instead, Mr. Clark, who was responsible for ensuring that Franchisees complied with the requirements of the summer promotional guidebook, testified the restaurants kept the $4 menus which were to be an insert in the regular menu in the back of the kitchen, and removed the drive-thru menu wings, window clings and flips.  Mr. Clark got rid of everything in both restaurants that would have alerted a customer to the fact that Defendants were supposed to be offering $4 meals.  In their place, Defendants offered guests menus which they printed – without Plaintiffs' consent – to charge the $4 meals at the price the meal would be if the meal items were purchased a la carte.  Thus, a $3.99 meal was increased to $5.08 on Defendants' printed menus.  Defendants were selling these meals as meals, but they were ringing the meals up – charging the guests – as if the meals were being purchased a la carte.

Defendants' printed menus were placed at the podiums at the restaurants so that guests would be given only the modified main menu with no $4 menu insert.  Guests would be given a $4 menu if they knew to ask for one – even though Mr. Clark understood that the $4 menu was to be handed as an insert in the menu to every patron who came into the restaurant.[4]

---

[4] Previously, during the preliminary injunction hearing, Mr. Clark testified that he was generally familiar with Plaintiffs' pricing policy, but was not aware of any pricing or marketing policy that required Franchisees to "hand every guest that walks in [their] store a $4 menu" or any policy that requires "the $4 menu be offered to all guests at all times."  (ECF No. 88-3, pp. 180, ll. 3-5, 192, ll. 15-20, 193, ll. 14-16.)  Mr. Clarks' subsequent deposition testimony, however, specifically confirmed he understood that under the "summer promotion guideline" "the requirement was…that [the] $4 menu be handed as an insert in the menu to every patron that comes in[.]"  (ECF No. 82-8, p. 190, ll. 9-15.)  Under such facts, the Court finds no conflict or inconsistency in Mr. Clark's testimony that would prevent summary judgment from entering.  *See* 10B Charles Alan Wright, *et al.*, Fed. Prac. & Proc. Civ. § 2738 (3d ed. Updated April 2015) ("[A] a witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier or later deposition, despite the greater reliability usually attributed to the deposition.  The

In May, 2013, Plaintiffs received complaints from customers at Defendants' Steak n

Shake restaurants that the $4 meals were being charged at higher prices.  In response, Plaintiffs

sent Elvin Leonardo from their standards assessment team to find out if the Defendants'

restaurants were charging higher prices.  Mr. Leonardo visited on May 16, 2013, and prepared a

report of his visit, attaching copies of menus and receipts he received when he visited the Denver

area restaurants as well as photographs of the locations.  Mr. Leonardo did not see any $4 menus

at the Centennial or Sheridan restaurants; the Defendants' menus contained prices higher than

that on Plaintiffs' authorized menus; the drive-thru menu boards showed white stickers covering

up prices; and the drive-thru extender where the $4 menu items should be displayed was not

there.  Mr. Leonardo's receipts from meals which he purchased at the two restaurants were rung

up as *a la carte* items.

As a result of what Plaintiffs learned, on May 23, 2013, they disabled the a la carte

function from the POS system on Defendants' computers so that they could no longer charge a

higher price – through the a la carte pricing – for the $4 meals.  Plaintiffs, however, had

overlooked one additional terminal at each of the two restaurants; therefore, Defendants were

able to continue to charge a la carte pricing for the $4 meals.  (ECF No. 90-12 (Steak n Shake

has "forgotten about 1 terminal in each store, so we are still able to [ring up things a la carte], for

now.").)  Also on that date, Defendants' counsel requested Plaintiffs to direct all communications

regarding pricing, the POS system, and the $4 menu to counsel.

From June 2-9, 2013, Kyle Whitney, Franchise Director, participated in a seven-day

breakfast program training at the Sheridan restaurant.  Mr. Whitney observed the $4 menu was

---

court may, however, consider whether the conflict creates a credibility issue preventing summary judgment from
being entered.").

not being offered at the Sheridan restaurant and spoke to Messrs. Bearns and Clark who informed him that, as to both restaurants, they would honor the $4 menu only on request – that is, only if a guest knew to ask for the $4 menu.  In addition, on June 4, Mr. Whitney visited the Centennial restaurant and noticed it did not have the $4 menu extender at the drive-thru.  After the training team's observations, by letter dated June 18, 2013, Plaintiffs emailed a notice of default to Defendants via their attorneys, which Defendants received.

In that letter, Plaintiffs stated Defendants were in default under the Franchise Agreements based on their failing to offer the $4 menu; printing menus without Plaintiffs' consent; altering of marketing materials; and charging prices higher than Plaintiffs' published menu prices. Plaintiffs stated that, while they had no legal obligation to do so, they were providing Defendants with notice and an opportunity to cure.  In order to cure, Defendants were required to: (i) begin offering the $4 menu to all guests and at all times; (ii) display all marketing materials related to the $4 menu pursuant to the current marketing promotional guide; (iii) agree in writing to participate in a Mystery Shop program designated by Plaintiffs at Franchisees' expense to confirm compliance with the Franchise Agreements; and (iv) agree in writing to pay Plaintiffs' travel expenses incurred to conduct a follow-up inspection to confirm that both restaurants were offering the $4 menu and displaying all marketing materials.  The deadline to cure was 5:00 p.m. (MDT) June 20, 2013.

Defendants responded to Plaintiffs by email on June 19 and 20, 2013.  In the June 19, email, Defendants claimed that the restaurants were in compliance with the $4 menu mandatory promotion by offering the meals listed on the $4 menu, although on different menus and at prices higher than $3.99.  In the June 20 email, Mr. Baerns attached pictures of the Sheridan and

Centennial drive-thru menu boards he had taken that date.  The picture of the Sheridan drive-thru menu board showed the price of regular drinks was blacked out, so that drive-thru customers' only drink option was to buy a large drink priced at $1.99.

Thereafter, on June 21, 2013, Plaintiffs sent Mr. Whitney to both restaurants.  Mr. Whitney observed the $4 menus were not being offered and could not be located at both restaurants and the $4 marketing materials were not being displayed.  In addition, Plaintiffs' records reflected that, between June 18 and June 21, 2013, on average, three $4 meals were sold in each of the Franchisees' restaurants, while, on average, 54 $4 meals were sold those dates in each corporate restaurant.[5]

By letter dated July 3, 2013, Plaintiffs terminated the Franchise and License Agreements pursuant to Section 11.1(A) of the Franchise Agreements and Section 2.2 of the License Agreements effective immediately.  Also by letter dated July 3, 2013, Plaintiffs terminated the ADA effective immediately because Defendants did not open the third restaurant by June 2, 2013, as required under the ADA.  Control was unable to meet the development schedule because it was unable to obtain financing.

In September 2013, after Plaintiffs terminated the Franchise and License Agreements, Defendants sought to sell the two Steak n Shake restaurants to third-parties.  There is no evidence that any contract was entered into or that any sale was made to a third-party.  Instead, Plaintiffs now operate the Sheridan and Centennial Steak n Shake restaurants.

---

[5] There appears to be some inconsistency in the evidence as to the number of $4 meals sold per day at the Defendants' restaurants during this time period, as to whether it was 1.5 per store per day according to oral testimony at the preliminary injunction hearing or 3 per store per day according to Deric Roberts' Declaration.  The Court, however, finds such inconsistency immaterial as the oral testimony was discussing Mr. Roberts' Declaration, which Declaration showed it was 3 per store per day.

### C.  The Documents

As relevant to this case, in connection with Defendants becoming franchisees, they were provided with a Financial Disclosure Document (the "FDD"), a Franchise Compliance Certification (the "FCC"), the Franchise Agreements, the License Agreements, the ADA, and the Guaranties.[6]  The parties disagree over the interpretation and effect of such documents, and/or whether any agreements were breached, as the case may be.

### 1.  The FDD

As to the FDD, Defendants contend there were misrepresentations associated with this document.[7]  Among other things, Item 19 provided certain information about historical financial performance and projected financial performance.  The FDD provided "Table One" which reflected the "average…performance" results of company-operated full-service Steak n Shake restaurants and "Table Two" which reflected the "projected average performance" results from certain franchised full-service Steak n Shake restaurants.  Table 2 reflected a 21.5% margin before rent, depreciation, administrative expenses, interest and taxes.  The FDD cautioned that the projections were estimates; stated there were no assurances that Defendants would do as well; stated that "[i]f you rely upon our figures, you must accept the risk of not doing as well"; and cautioned that they did not account for certain factors, such as diminishing sales following initial exuberance, seasonality, or general economic or market conditions.  The FDD also stated that food costs varied depending on vendor, and that labor costs and supply costs varied based on

---

[6] The Guaranties are exhibits to the Franchise Agreements.

[7] Defendants attached an FDD with an issuance date of June16, 2011, which they contend was false or materially misleading.  (ECF No. 51, Counterclaims, ¶¶17, 18; No. 19-1, p. 1.)  Defendants' Amended Answer also contained allegations that on March 1, 2013, they received a revised FDD which included misrepresentations regarding operating expenses.  (ECF No. 51, Counterclaims, ¶58.)  The parties, however, did not argue about this particular FDD.  Regardless, as this FDD was received *after* Defendants invested in Steak n Shake, it cannot serve as a basis for allegedly fraudulently inducing Defendants to invest in Steak n Shake.

location, competitive conditions, and local pricing.  Defendants had their CPA look at the

numbers in the FDD, consulted with their attorney, did their own calculations, and did a lot of

research.  (ECF No. 82-3, pp. 201, 202.)

### 2. The FCC

In addition to entering into the Franchise Agreements and ADA, Defendants signed

two FCCs[8] which contained a questionnaire, the stated purpose of which was "to determine

whether any statements or promises were made to you that the Franchisor has not authorized and

that may be untrue, inaccurate or misleading."  (ECF No. 72-1, Exhibits 1, 2.)  In the FCCs, via

responses to individual questions, Defendants certified that Plaintiffs made no oral

representations to them about earnings, operating costs, or support relating to a Steak n Shake

restaurant upon which they relied to enter into the agreements.  Defendants also reported they

understood the Franchise Agreements contained the entire agreement between the parties, and

that prior oral or written statements not in the Franchise Agreements would not be binding.  In

addition, Defendants acknowledged that they understood that "maintaining uniformity in every

component of the operation of the System[,]" was essential to the success of Steak n Shake,

"including a designated menu (including the maximum, minimum, or other prices the Franchisor

specifie[d] for menu items)…."  (ECF No. 72-1, Ex. 1, FCC, Question 21.)

---

[8] One FCC related to FDDs with issuance dates of June 16, 2011 and January 24, 2011, while the other FCC related to an FDD with an issuance date of January 27, 2012.  Both FCCs were signed at or about, or before, the Franchise Agreements were signed.

### 3.  The Franchise Agreements

As for the Franchise Agreements, Plaintiffs contend they were knowingly and materially

breached.  As relevant to the parties' dispute, the Franchise Agreements required Franchisees to,

among other things, perform as follows:

(1)    "Franchise acknowledges that maintaining uniformity in every component
of the operation of the System[9] is essential to the success of the entire chain of
Steak n Shake Restaurants, including a designated menu (including maximum,
minimum, or other prices the Franchisor specifies for menu items and mandatory
promotions); uniformity of food and beverage specifications; preparation
methods; quality and appearance; and uniformity of facilities and service."
(Section 1.5(C).);

(2)     "Franchisee agrees to comply with the entire System, as revised time
from time by the Franchisor."  (Section 1.5(D).);

(3)    "…Franchisee agrees: (A) to serve, sell or offer for sale all of the (and
only the) food and beverage products and merchandise that: (i) are listed in the
then-current standard menu or menus specified by the Franchisor…."  (Section
4.1(A).);

(4)     "…Franchisee agrees:…(C) not to deviate from the Franchisor's
standards, specifications and procedures for serving or selling the same
(including, to the fullest extent the law allows, the maximum, minimum, or other
prices for products and services offered and sold by Steak n Shake Restaurants
and mandatory promotions) without the Franchisor's prior written consent;"
(Section 4.1(C).);

(5)    "Franchisee must fully participate in all local, regional, seasonal,
promotional and other  programs, initiatives and campaigns adopted by
Franchisor that Franchisor requires Franchisee to participate in."  (Section
5.1(F).); and

(6)    "Franchisor shall have the sole exclusive right to print menus to be used in
the Restaurant, and Franchisee may not print menus without Franchisor['s] prior
written approval, which may be withheld in Franchisor's sole discretion."
(Section 7.1(A).)

---

[9] "System" is defined to mean "the business methods, designs, know-how and arrangements for developing and
operating [Steak n Shake] restaurants…which include the Marks,…menu and merchandising…."  (ECF Nos. 11-4 &
11-6, Section 1.1(R).)

(ECF Nos. 11-4, 11-6.)

The Franchise Agreements also set forth events of default and the parties' right to terminate the agreements. For defaults under Section 11.1(A), Plaintiffs may terminate the Franchise Agreements, without affording Defendants any opportunity to cure the default, effective immediately upon receipt of written notice by Defendants, if Defendants "knowingly [sell] products for a price in excess of any maximum prices established by Franchisor from time to time or knowingly [fail] to offer a mandatory promotion." Defaults under Section 11.1(B), however, required notice and a 30-day cure period.

In addition, the Franchise Agreements contained an integration and "no representation" provision. As relevant to the issues, Section 16.9 of the Franchise Agreements provided:

> …[The Franchise Agreement] constitute[s] the entire agreement of the parties with reference to the subject matter of this Agreement and which supersede all prior negotiations, commitments, representations and undertakings of the parties; provided, however, that nothing in this or any related agreement is intended to disclaim the representations the Franchisor made in the franchise disclosure document that the Franchisor furnished to the Franchisee. Franchisee acknowledges that Franchisee is entering into this Agreement and all ancillary documents executed contemporaneously with this Agreement, as a result of Franchisee's own independent investigation of the Restaurant, and not as a result of any representations made by the Franchisor's officers, directors, employees, agents, representatives, shareholders, independent contractors or franchisees which are contrary to this Agreement or any disclosure document provided to the Franchisee.

(ECF Nos. 11-4 & 11-6, Section 16.9.)[10]

### 4. The License Agreements

Steak n Shake restaurants use federally-registered trademarks, including the "Steak n Shake" mark, owned by Plaintiff Steak n Shake, LLC. The License Agreements allowed Defendants to use the Shake n Steak "Marks" (as that term is defined in such agreements) during the term of the Franchise Agreements. Defendants' rights automatically terminated, however, without notice if they are in default under Article 11 of the Franchise Agreements beyond the cure period, if any.

### 5. The Area Development Agreement

Pursuant to the terms of the ADA, Control was required to open a third Steak n Shake restaurant by June 2, 2013. Any change or amendment to the ADA is not binding upon the parties "unless in writing and signed by Franchisor and Franchisee." (ECF No. 11-3, ¶8.12.)

### 6. The Guaranties

Guarantors personally guaranteed each of the Franchisees' obligations under their respective Franchise and License Agreements, and made post-termination covenants not to compete. Franchisees agreed, that upon termination of the Franchise Agreements, they would cease using Steak n Shake Marks, and proprietary and confidential information; de-identify their restaurants and change the exterior and interior of the restaurants to distinguish them from a

---

[10] In addition, although not addressed by the parties, the Franchise Agreements stated that "Franchisee acknowledges that Franchisee has received a copy of Franchisor's franchise disclosure document and has had a full and adequate opportunity to be thoroughly advised of the terms and conditions of this Franchise Agreement by counsel of Franchisee's own choosing at least fourteen (14) calendar days prior to execution of this Agreement and/or payment of any consideration to Franchisor and Franchisee is entering into this Franchise Agreement after having made an independent investigation and not upon any representation as to the profits and/or sales volume which Franchisee might be expected to realize." (ECF Nos. 11-4 & 11-6, Section 17.1.)

Steak n Shake restaurant; assign the telephone number and web address associated with their former franchised Steak n Shake restaurants to Plaintiffs; and pay all amounts owed and damages sustained by Plaintiffs by reason of termination of the Franchise Agreements.  In addition, Defendants, including Guarantors, agreed that for a two-year period following termination of the Franchise Agreements, they would not have any interest in a competing business, as that term is defined in the parties' Franchise Agreements and ADA, located within five miles of their former franchised Steak n Shake restaurants or any other Steak n Shake restaurant, and with regard to Control, within its development area.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569-70 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).  Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial.  *See 1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).  Conclusory, self-serving, and generalized statements or denials are insufficient to create a factual dispute, as are mere arguments.  *See Valley Forge Ins.*

16

*Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1095 n.2 (10th Cir. 2010) (conclusory and self-serving affidavit); *Sartori v. Susan C. Little & Assocs., P.A.*, No. 13-2162, 571 F. App'x 677, 680 (10th Cir. July 9, 2014) (conclusory, self-serving, and generalized denials are insufficient at the summary judgment stage); *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 834 (10th Cir. 1986) ("Conclusory allegations, general denials, or mere argument of an opposing party's case cannot be utilized to avoid summary judgment.") Instead, the nonmovant "must set forth evidence sufficient for a reasonable jury to return a verdict in [its] favor." *Rice v. U.S.,* 166 F.3d 1088, 1092 (10th Cir. 1999). The facts must be considered in the light most favorable to the nonmoving party. *Cillo v. City of Greenwood Vill.,* 739 F.3d 451, 461 (10th Cir. 2013).

## IV.    GOVERNING LAW

Plaintiffs' claims are brought under the Lanham Act and common law. In the Motion, Plaintiffs rely on Colorado law for their common law claims. Defendants argue – in footnotes and without further analysis– that pursuant to the terms of the Franchise Agreements, Indiana law applies. (ECF No. 87, pp. 5 n.3, 15 n.6.) Plaintiffs' Reply offers little assistance on the issue, stating that Defendants' citation to Indiana law is "interesting given that throughout the litigation they have relied on Colorado law…but irrelevant, except that it dooms their claims for breach of the implied duty of good faith and fair dealing…and violation of the Colorado Consumer Protection Act, which they have now withdrawn…." (ECF No. 89, p. 3 n.3.) Plaintiffs' Reply then goes on to rely, in most instances, on Colorado and Indiana law.

The Franchise Agreements[11] provide, in relevant part:

**Section 15.4 Governing Law.**

Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, this Agreement, the franchise, and all claims arising from the relationship between Franchisee and the Franchisor will be governed by the laws of the State of Indiana, without regard to its conflict of laws rules, except that any Indiana law regulating the offer and sale of franchises or governing the relationship between a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this Section 15.4.  Franchisee and Franchisor acknowledge that the parties' agreement regarding applicable state law and forum set forth in the sections above provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising out of this Agreement or the parties' relationship created by this Agreement. Franchisee and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

(ECF No. 11-4, p. 60; No. 11-6, p. 59.)   Defendants raise the choice of law argument without analysis; therefore, the Court deems this argument waived.  *See Cahill v. American Fam. Mut. Ins. Co.*, 610 F.3d 1235, 1239 (10th Cir. 2010).

Even assuming, *arguendo*, this argument is not waived, it is unclear whether this provision would apply under its own terms or otherwise.[12]  *See, e.g.,* Restatement (Second) of Conflicts of Laws § 187 (1988) ("Law of the State Chosen by Parties"); *Target Corp. v. Prestige Maint. USA, Ltd.*, No. 12CA0445, 2013 WL 363324, at *2 (Colo. App. April 18, 2013) (court will apply law chosen by parties unless no reasonable basis for choice or applying chosen state's law could be contrary to the fundamental policy of the state whose law would otherwise govern) (citing *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 113 (Colo. App. 1994)).  Nonetheless,

---

[11] *See also* License Agreements and ADA.  (ECF No. 11-3, §8.02 (ADA); Nos. 11-5 and 11-7, §4.6 (License Agreements).)

[12] "In a diversity action[, the Court] applies the conflict-of-laws rules of the forum state."  *Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014) (citing *TPLC, Inc. v. United Nat'l Ins. Co.*, 44 F.3d 1484, 1490 (10th Cir.1995)).

both parties have relied on Colorado and Indiana law.  Accordingly, the Court will apply

Colorado and Indiana law in those instances where the parties have done so.  *See Hill v. Kemp*,

478 F.3d 1236, 1251 (10th Cir. 2007) (The court is not precluded "from supplementing the

contentions of counsel through its own efforts."  But, it is also not compelled "to undertake such

self-directed research or pursue late and undeveloped arguments….").

## V.    LEGAL ANALYSIS

### A.  PLAINTIFFS' BREACH OF CONTRACT CLAIMS (COUNTS III, IV, V)[13]

#### 1.  Breach of Franchise and License Agreements

Plaintiffs contend they properly terminated the Franchise and License agreements for

cause on July 3, 2013, because Defendants "knowingly" and materially breached the Franchise

Agreements in four ways: (1) failing to offer the $4 menu and to display all marketing materials

related to that promotion; (2) printing menus without Steak n Shake's consent; (3) altering

marketing materials; and (4) charging prices exceeding Steak n Shake's menu prices.

Defendants argue that summary judgment is precluded because: (1) whether a party has

materially breached an agreement is a question of fact; (2) there are disputed facts as to whether

any of the four alleged breaches occurred and whether any breach continued after the cure period

provided by Plaintiffs; and (3) they did not "knowingly" breach any term.

In this case, none of the parties have argued any of the agreements are ambiguous, and

the Court's own examination finds they are not.  Accordingly, the proper construction of the

unambiguous contracts is a question of law for the court.  *U.S. Fidelity & Guar. Co. v. Budget*

---

[13] The parties' arguments are based on the Franchise Agreements.  As previously stated, under the terms of the License Agreements, the Franchisees are in default under the License Agreements if they are in default under the Franchise Agreements.

*Rent-A-Car Systems, Inc.*, 842 P.2d 208, 211 (Colo. 1992); *Will v. Meridian Ins. Group, Inc.*, 776 N.E.2d 1233, 1235 (Ind. App. 2002).  Based on the arguments of the parties, at issue are: (1) whether the Franchisees breached the terms of the Franchise Agreements; (2) if so, whether the breaches were material and done knowingly; and (3) whether notice and opportunity to cure were required.

### a)  Franchisees Breached the Franchise Agreements

#### *(1) Failing to offer Steak n Shake's $4 menu and display marketing materials*

The Franchise Agreements required Franchisees to comply with Plaintiffs' entire "System," including their mandatory promotions.  In turn, Plaintiffs' Summer Promotion required that the $4 menu be placed in each of the Lunch/Dinner menus from 11 a.m. to Midnight and Midnight to 6:00 a.m. as part of the franchisees' "Menu Delivery to the Guest." (ECF No. 82-5, SNS_007089.)  The undisputed material facts show that Franchisees printed their own menus (using Plaintiffs' menu as a template) which were offered to guests in their restaurants and offered Plaintiffs' $4 menu to guests only if they requested one.  Accordingly, Franchisees failed to offer Plaintiffs' $4 menu in breach of the Franchisee Agreements.

Defendants argue that Franchisees "offered the $4 menu items," sales reports generated for their restaurants indicate that $4 menu items were being sold, and Mr. Bearns' denial that Franchisees "did not operate the $4 menu" demonstrate there are factual disputes rendering summary judgment inappropriate.  The Court finds otherwise in light of Mr. Clark's testimony that the $4 menus were only "offered" to those who requested the menu.  In addition, Mr. Bearn's conclusory, general denial is insufficient, especially where the evidence is that Defendants' denial is based on the premise that providing a guest a $4 menu upon request

constitutes offering the guest a menu.  Such "offer" does not comply with the requirements under the Summer Promotion.  Based on such facts, it also follows that the sale of $4 menu items does not establish compliance as such sales would have occurred because the guest knew to ask for the $4 menu.  Accordingly, Defendants' facts are insufficient to establish any material dispute sufficient to defeat summary judgment on this issue.

Similarly, the undisputed material facts establish Defendants failed to display all required marketing materials for the Summer Promotion.  Plaintiffs have shown that they delivered the promotion materials to Franchisees, Mr. Clark testified that he removed the $4 menu marketing materials (including the window clings), and Mr. Baerns admitted to Plaintiffs that Defendants had the marketing materials.  Defendants, however, argue the Franchisees could not have complied because they did not receive *all* the marketing materials, such as the $4 menu buttons and window clings.  Defendants provided no *evidence* – such as an affidavit – to support the *argument* that Franchisees did not receive all marketing materials.  Instead, Defendants rely on the evidence that they placed an order for some marketing materials on June 24, 2013, after receiving the June 18, 2013, notice of default.  The placement of an order for some marketing materials, without more, does not raise an inference that Defendants did not previously have such marketing materials in light of the other evidence to the contrary, such as Mr. Clark's testimony that he removed the window clings and got rid of the marketing materials.  Accordingly, Plaintiffs have also shown they are entitled to summary judgment on this issue.[14]

---

[14] Defendants also argue there is no evidence that they failed to display marketing materials *after* the cure period expired.  Assuming a cure period was required, what is at issue is whether Defendants were in compliance by the deadline of the cure period, not after.

*(2) Printing menus without Steak n Shake's consent*

The Franchise Agreements provided that Plaintiffs have the sole exclusive right to print menus to be used in the restaurants and that a franchisee may not do so without Plaintiffs' written approval.  Here, the material undisputed facts establish Defendants printed their own menus, using Plaintiffs' $4 menu as a template and altering the prices they set, all without Plaintiffs' approval.  And, as previously discussed, it was these altered menus which Defendants provided to their guests in the restaurants.  Defendants summarily argue that there are disputed facts as to such breach but offer no further analysis and identify no such facts for the Court's consideration.  As such, Plaintiffs have established a violation of the Franchise Agreements.

*(3) Altering marketing materials*

As previously stated, the Franchise Agreements required Franchisees to comply with Plaintiffs' entire "System," including its mandatory promotions.  As part of the Summer Promotion, Plaintiffs provided Franchisees with menus and drive-thru menu boards to promote and sell the $4 meals and other products.  The undisputed material facts show that Defendants altered these materials used to market the Summer Promotion.  As such, Plaintiffs have established Defendants breached the Franchise Agreements in this regard.

*(4) Charging prices exceeding Steak n Shake's menu prices*

The Franchise Agreements required Defendants to comply with the requirements of the System, "including a designated menu (including the maximum, minimum, or other prices the Franchisor specifies for menu items and mandatory promotions)…."  Plaintiffs argue there is no dispute that Defendants increased prices for not only the meals on the $4 menu promotion but also other food items, such as the Bleu Ribbon Steakburger meal and drinks purchased at the

drive-thru.  Defendants contend they did not exceed the menu prices because Franchisees charged prices established, set, and controlled by Plaintiffs through the POS.  In other words, Defendants assert that because they charged *a la carte prices* set, established, and controlled by Steak n Shake, they were charging "prices the Franchisor specifies."  And, further, Defendants assert that it is a question of fact whether such conduct is a breach of the Franchise Agreements. The Court finds otherwise.

Section 1.5(C) of the Franchise Agreements is unambiguous and required Franchisees to comply with "designated menus" – Steak n Shake's official menus – such as the $4 menu.  The $4 menu provided for $3.99 *meals*, not a $5.08 combination of a la carte items which the Franchisees sold in the guise as meals.  In addition, Defendants wholly fail to adequately address how charging $1.99 for a regular size drink which the Franchisees sold as a large size drink did not violate Plaintiffs' prices.  Indisputably, such pricing not only violated the Franchise Agreements but also – as acknowledged by Mr. Clark – was deceptive.

**b)  Franchisees "Knowingly" and Materially Breached the Franchise Agreements**

Defendants argue that because there is a question of fact as to whether they failed to offer the $4 menu, Plaintiffs cannot establish that Franchisees knowingly violated the Franchise Agreements to trigger the automatic termination provision under Section 11.1(A).  As the Court has found there is no question of fact that Franchisees violated the Franchise Agreements, under Defendants' argument, it follows that Plaintiffs have also shown Defendants' actions were taken "knowingly."

Defendants also contend they did not knowingly breach the Franchise Agreements because Defendants "consulted" with Plaintiffs regarding pricing issues; Plaintiffs knew of but

23

did not object to Defendants' implementation of the a la carte pricing; Mr. Valentino "promised" that pricing would be approved; and Plaintiffs' Franchise Director Doug Stebbins "encouraged" Defendants regarding their pricing policy.  The Court finds the evidence shows otherwise.

First, Defendants' cited evidence does not support most of their contentions.  There was no "consultation" about pricing issues.  As for Plaintiffs' knowledge of such pricing, Defendants' own evidence shows they debated on whether to notify Plaintiffs of their plans. And, Mr. Valentino's "promise" – which is disputed but accepted for the purposes of the Motion – that pricing "would be approved" supports a finding that such pricing had not been approved.[15]

Black's Law Dictionary defines "knowing" as "[h]aving or showing awareness or understanding; well-informed" and "[d]eliberate; conscious."  Black's Law Dictionary 1003 (10th ed. 2014).  In this case, the material undisputed facts are as follows:

- Defendants signed the FCCs acknowledging the requirement to maintain uniformity, including the designated menu, and strictly adhere to standardized pricing requirements;

- Plaintiffs held a franchisee call in to discuss the roll out of the $4 menu promotion, in which Mr. Baerns participated;

- Defendants received the Summer Promotion guide and marketing materials;

- Plaintiffs' $4 menus listed the prices of the meals at $3.99;

---

[15] Defendants' reliance on Mr. Stebbins' "encouragement" is similarly unavailing to support a contrary finding or preclude a finding that Defendants "knowingly" sold food in excess of the maximum prices Plaintiffs established or "knowingly" failed to offer a mandatory promotion.  There is no evidence that Mr. Stebbins approved, or had authority to approve, such pricing.  Further, Mr. Stebbins' alleged words of "encouragement" were conclusory and general – for example, there is no evidence he encouraged Defendants to discard the $4 menus, print new menus with different pricing, and otherwise change the prices which Plaintiffs established.  Such general statements, even assuming they were made, are insufficient in light of the overwhelming undisputed material facts which establish Defendants' conduct was done "knowingly."

- In order to sell the meals at prices above $3.99 stated in the menus, or otherwise increase prices, Defendants had to:

  (i)     alter Plaintiffs' menus and print new ones reflecting the a la carte pricing the Defendants decided to use;

  (ii)    alter Plaintiffs' menu boards to increase the prices;

  (iii)   ring in the meals on the POS system as separate items rather than as meals;

  (iv)    remove all traces of the $4 menu promotion, such as the window clings and menu extenders/wings, and offer the $4 menu only if a guest knew to ask; and

  (v)     ring in a large drink with each meal at the drive-thru to increase the price by $0.50, but serve the guest a regular drink even though the guest paid for a large drink;

- Plaintiffs overlooked one of the terminals at each of the restaurants when they disabled the a la carte function.  Defendants' response was that they would continue to use the function on the unaffected terminals until Plaintiffs "figure[d] it out";

- Bearns Sr. raised the question of why ringing the items in the $3.99 meals as a la carte items rather than meals would not be a violation of the Franchise Agreements; and

- Mr. Baerns recognized that using the a la carte pricing could be construed as a direct violation of the Franchise Agreements.

These facts show that no reasonable mind could disagree that Defendants "knowingly" sold products (such as the $4 meals) for a price in excess of any maximum prices established by Plaintiffs and "knowingly" failed to offer a mandatory promotion.

Defendants also argue that whether any breaches were material is a question of fact, citing to *Canada Dry Corp. v. Nehi Bev. Co., Inc.*, 723 F.2d 512 (7th Cir. 1983).  While *Canada Dry* recognized that materiality of a contractual breach is a question of fact, that court did so in the context of finding there was a sufficient dispute concerning the asserted breaches that a jury could reasonably conclude the alleged breaches were not material.  Such is not the case here.  Instead, as the Colorado and Indiana courts recognize, where reasonable minds could not differ on an issue, the question becomes one of law for the court.  *See Thorne v. Bauder*, 981 P.2d 662, 664 (Colo. App. 1998) (where reasonable minds could not differ on the issue of materiality of information, the question becomes one of law for the court); *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458, 480 (1937) ("[W]hen reasonable men could draw but one inference from the facts, materiality is a question of law for the court."); *T & W Bldg. Co. v. Merrillville Sport & Fitness, Inc.*, 529 N.E.2d 865, 866 (Ind. App. 1988) (where reasonable minds could not differ on question of reasonableness, issue becomes question of law); *von Gonten v. Research Sys. Corp.*, 739 F.3d 1264, 1267 (7th Cir. 1984) ("[W]hether an employee has materially breached an employment contract…is a question of fact for the jury *if* reasonable persons might differ as to whether the alleged misconduct justified discharge.") (emphasis added).  Accordingly, the Court finds as a matter of law that Defendants' breaches were material.

## 2.  Breach of the Area Development Agreement

Under the terms of the ADA, Control was required to open a third Steak n Shake restaurant by June 2, 2013.  Control did not do so because it was unable to secure financing. Defendants do not dispute they did not comply with the schedule but argue Plaintiffs, through their then Vice President of Marketing and Investor Relations, assured them that compliance was

not mandatory and would not result in a default.  Defendants cite no theory or supporting law as to how such assurance negates Control's requirement to open another Steak n Shake.  Therefore, it will not be considered.  *See Cahill,* 610 F.3d at 1239.

Moreover, even if the Court were to construe Defendants' contention as a claim that the ADA was orally modified, as Plaintiffs have done, the Court agrees that, under the ADA, any change or amendment requires a writing signed by the parties.  Defendants provide no evidence that any such writing exists, or argument as to why this requirement does not apply.  Accordingly, Control breached the ADA by not opening a third restaurant by June 2, 2013.[16]

### 3.  Breach of Guaranties

Pursuant to the terms of the Guaranties, Guarantors each guaranteed the performance of Franchisees' obligation under their respective Franchise and License Agreements.  Defendants argue that the same questions of fact which preclude summary judgment on the breach of the Franchise Agreements preclude summary judgment as to the Guaranties.  It follows, therefore, that as the Court has found in favor of Plaintiffs on the breach of Franchise Agreements, summary judgment in favor of Plaintiffs is also warranted on the Guaranties.

### 4.  The Terminations were effective

Defendants contend that if Plaintiffs cannot establish Defendants' actions were taken knowingly, then Plaintiffs were required to provide Defendants with a 30-day cure period.  Defendants also argue there is no allegation that a valid notice of default was delivered to them

---

[16] An examination of the Amended Complaint shows that while it contains allegations that Defendants breached the ADA no specific claim for breach of the ADA is pled.  (ECF No. 10, pp. 8-9 (allegations), 11-14(Counts).)  Nonetheless, the Final Pretrial Order specifically identifies this action as one which arises from the termination of the parties' agreements, including the ADA; the parties have apparently engaged in discovery on this issue; and the parties have briefed the issue as if such a claim is specifically pled. (*E.g.,* ECF No. 94, pp. 2-3; No. 81, p. 7; No. 87, p. 10; No. 89, p. 8.)  Accordingly, the Court will decide this issue.

pursuant to the terms of the Franchise Agreements and, even if a valid notice was provided,

Plaintiffs have not provided evidence the defects were not cured within the 30-day period.

Plaintiffs argue that all violations were taken "knowingly" and, although they were not required

to do so, notice of defaults and an opportunity to cure was provided but Defendants elected not to

cure.

Plaintiffs' June 18, 2013, notice of default relied on Section 11.1(A)(iii) of the Franchise

Agreements, which allows for immediate termination without a right to cure.  The parties'

arguments appear to implicitly agree that all the conduct on which the notice of default was

based falls within the prohibition of Section 11.1(A)(iii) and the only issue is whether the

conduct was done "knowingly."[17]  As discussed above, the Court finds that Defendants

knowingly breached the Franchise Agreements.  Accordingly, based on the parties' position, no

30-day cure period was required.

Nonetheless, Plaintiffs offered Defendants an opportunity to cure by June 20, 2013.[18]

Among the cure requirements were for Franchisees to offer the $4 menu to all guests at all times,

and to display all marketing materials related to the $4 menu.  Defendants contend Plaintiffs

have not provided any evidence that the violations were not cured within the 30-day cure

window.  Plaintiffs' deadline, however, was not 30 days, but by June 20, 2013.  And, as shown

by the photographs Mr. Baerns forwarded to Plaintiffs on that date, at a minimum, the Sheridan

---

[17] Based on the record and arguments then before the Court, in its Order granting, in part, Plaintiffs' Motion for Preliminary Injunction, the Court found that two of the four violations complained of fell within the Franchise Agreements' provision allowing termination after notice of default and a franchisee's failure to cure within 30 days of such notice.  In light of the parties' current positions, the Court will assume, without deciding, that all of the violations complained of – if done "knowingly" - would fall within the scope of Section 11.1(A)(iii).  Nonetheless, even if only two of the violations fell within Section 11.1(A)(iii) allowing for immediate termination, the result would be the same – those two violations were sufficient to allow Plaintiffs to immediately terminate without notice and an opportunity to cure.
[18] If no opportunity to cure was required, then it follows that any defect in the manner or method of the notice of default is irrelevant.  In addition, no 30-day period to cure was required.

drive-thru menu board showed it had been altered to cover regular-sized drinks so that the drive-thru customers' only drink option was to buy a large drink.  Further, on June 21, 2013, Mr. Whitney visited both restaurants to determine if the $4 menu was being offered to each guest and the associated marketing materials were displayed, and found no $4 menus were being given to customers and no $4 menu promotional materials were in use.  As such, Defendants' evidence that the $4 menu was handed to guests or items from that menu were offered to guests in June 2013, without more, is insufficient.[19]

Equally unavailing is Defendants' contention that Franchisees could not have rung up items a la carte after May 23, 2013, as that function was disabled when they are well aware that they each had one terminal which Plaintiffs had overlooked.  Finally, Defendants' argument that they did not have all the marketing materials is futile where, as previously discussed, Mr. Clark testified Franchisees had the $4 menus and other marketing materials.  Accordingly, Plaintiffs have shown that Franchisees failed to cure within the time allotted.[20]  Accordingly, Plaintiffs' July 3, 2013, letters effectively terminated the Franchise and License Agreements and the ADA.  And, upon that termination, Defendants' rights under all of these agreements ceased.

## B. PLAINTIFFS' TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS (COUNTS I AND II)

### 1. Plaintiffs' Request for Summary Judgment

The central inquiry on trademark infringement and unfair competition claims under the Lanham Act is the likelihood of consumer confusion.  15 U.S.C. §§ 1114(1), 1125(a); *see*

---

[19] The issue here is not whether Defendants offered guests the $4 menu or correctly charged guests for the price of meals or food as set by Plaintiffs at *some* date or time in June, but, rather, whether Defendants cured within the time allotted, *i.e.,* by June 20, 2013.

[20] Indeed, Defendants appear uncertain whether they cured or "substantially cured" and whether it was prior to or after the June 18, 2013 letter.  (*E.g.,* ECF No. 90, ¶ 61.)

*Beltronics USA, Inc. v. Midwest Inv. Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009);

*Winmark Corp. v. Schneeberger*, No. 13-cv-0274-WJM-BNB, 2013 WL 1154506, at *5 (D.

Colo. March 19, 2013). "It is well settled doctrine that a terminated franchisee's continued use

of its former franchisor's trademarks, by its very nature, constitutes trademark infringement."

*Winmark*, 2013 WL 1154506, at *5 (quotation marks and citation omitted). Further, "[a]

licensee who once had authorization becomes associated in the public mind with the licensor or

franchisor. When such a party loses authorization but continues use of the mark, the potential for

consumer confusion is greater than in the case of the random infringer." 4 J. Thomas McCarthy,

McCarthy on Trademarks and Unfair Competition § 25:31 (4th ed. 2013) (internal quotation

marks and citation omitted).

Defendants contend summary judgment is not warranted on these claims because

questions of fact remain as to the propriety of the termination of the Franchise Agreements. But,

the Court has found the Franchise Agreements were properly terminated and, upon termination,

all rights to the use of the Marks ceased. As such, any unauthorized use of Plaintiffs' marks by

Defendants is likely to cause consumer confusion. Accordingly, Plaintiffs are entitled to

summary judgment on these two claims.

### 2. Plaintiffs' Request for Permanent Injunctive Relief and Damages

In addition to summary judgment on these claims, Plaintiffs seek an order for permanent

injunctive relief and damages as to Defendants' unauthorized use of the Marks and permanent

injunctive relief on the contractual covenants not to compete. In this case, Defendants continued

to operate the two restaurants as Steak n Shake restaurants, using the Steak n Shake Marks and

name, offering the same products and services as authorized Steak n Shake restaurants, and at the

same locations as Franchisees' terminated franchised Steak n Shake restaurants, up until the time

the Court's preliminary injunction Order was issued.  Since the injunction was issued,

Defendants have ceased using the Marks and operating Steak n Shake restaurants.  There is no

evidence that Defendants are, or have been, competing.  At issue is whether Plaintiffs' request

should be granted in light of these – and other – facts.

### a)   Permanent Injunctive Relief

"To obtain a permanent injunction, a plaintiff must show: '(1) actual success on the

merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs

the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will

not adversely affect the public interest.'" *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir.

2014) (quoting *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009)).   It is

"the movant's burden to establish that each of these factors tips in his or her favor."  *Heideman v.*

*South Salt Lake City*, 348 F.3d 1182, 1188–89 (10th Cir. 2003) (citation omitted).

Defendants' opposition to injunctive relief relies on the same argument made as to the

entry of summary judgment in favor of Plaintiffs on their trademark/unfair competition claims –

that there are questions of fact as to the propriety of the terminations of the Franchise

Agreement.  However, the Court has found otherwise.

Plaintiffs' request for injunctive relief is two-fold: the permanent cessation of the use of

Plaintiffs' Marks; and the permanent enforcement of the covenants not to compete.  Plaintiffs did

not specifically address the injunctive relief factors but, instead, referred the Court to its Order

granting preliminary injunctive relief.  The Court finds that its analysis in granting preliminary

injunctive relief applies to Plaintiffs' request to make the preliminary injunction permanent, but

only as to the injunction against the use of the Marks or otherwise identifying Defendants as being associated with Steak n Shake.

Starting with the use of the Marks, all requirements are met.  First, Plaintiffs have established actual success on the merits of their breach of contract claims and trademark/unfair competition claims.  Second, in light of Defendants' actions taken before preliminary injunctive relief was ordered – such as selling regular size drinks in the guise of large size drinks and charging for meals as if the customers purchased a la carte items – irreparable harm to Plaintiffs' Marks, goodwill, reputation, and business has occurred and will occur if Defendants are not permanently enjoined from using Plaintiffs' Marks or otherwise identifying themselves as being associated with Plaintiffs.  Third, the threatened injury to Plaintiffs far outweighs the harm that the injunction may cause Defendants.  Having found the agreements were properly terminated, Defendants are no longer franchisees or licensees, no longer have any right to develop Steak n Shake restaurants, and no longer have any legal right to use the Marks or otherwise identify themselves as associated with Steak n Shake.  And, since the issuance of the preliminary injunction, Defendants no longer operate Steak n Shake restaurants.  Finally, the issuance of a permanent injunction will not adversely affect the public interest.  The unauthorized use of the Steak n Shake brand by Defendants will certainly cause consumer confusion, especially in light of the fact that Plaintiffs are now operating the two restaurants at issue.

As for the covenant not to compete, however, Plaintiffs have not made the requisite showing.  First, as stated, the Court has found the agreements at issue were breached and properly terminated.  In addition, as the Court previously found, the duration and geographic scope of such covenants are reasonable.  The facts before the Court now, however, are not the

same as that when it granted preliminary injunctive relief, and such difference impacts the

propriety of making permanent the preliminary injunction previously entered as to the covenants.

At that time, Defendants were operating Steak n Shake restaurants in the Sheridan and

Centennial locations.  The preliminary injunctive relief previously granted as to the covenant not

to compete was based on the cessation of the operation of the Centennial and Sheridan

restaurants *as* Steak n Shake restaurants.  Those restaurants, however, are Steak n Shake

restaurants, albeit operated now by Steak n Shake.  In light of this change, the Court finds

Plaintiffs' reliance on the Order insufficient to show that the preliminary injunction as to the

covenant not to compete should now be made permanent.  Instead, Plaintiffs may raise that issue

at the status conference.

### b)  Plaintiffs' Request for Damages

Plaintiffs' request for damages, fees and costs is based on the Lanham Act.  Pursuant to

15 U.S.C. § 1117(a), when a Lanham Act violation has been established, the plaintiff "shall be

entitled" – "subject to the principles of equity" – to recover defendant's profits, damages

sustained by the plaintiff, and the costs of the action.  In "exceptional cases," attorney's fees may

also be awarded to the prevailing party.  *Id.*  "The court shall assess such profits and damages or

cause the same to be assessed under its direction.  In assessing profits the plaintiff shall be

required to prove defendant's sales only; defendant must prove all elements of cost or deduction

claimed."  *Id.*  In addition, "[i]n assessing damages the court may enter judgment, according to

the circumstances of the case, for any sum above the amount found as actual damages, not

exceeding three times such amount."  *Id.*  In construing this provision, the Tenth Circuit has held

that "[u]nder the Lanham Act, plaintiffs must show either actual damages or willful action on the

part of the defendant as a prerequisite to recover disgorgement of profits." *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir. 2013) (citations omitted).  "[T]he willfulness required for a disgorgement award is the intent to benefit from the goodwill or reputation of the trademark holder." *Englert*, 711 F.3d at 1162 (internal quotation marks and citation omitted).

In this case, Plaintiffs seek damages under § 1117(a) from the time the Franchise Agreements were terminated to the time Defendants complied with the preliminary injunction Order.  In order to determine such damages, Plaintiffs request the Court to order Defendants to submit to an accounting of profits and to schedule a hearing on the issue of damages, including fees and costs.  Plaintiffs may raise this issue at the status conference.

### C.  DEFENDANTS' DECLARATORY JUDGMENT AND BREACH OF CONTRACT CLAIMS (COUNTS I, III, V)

Defendants' breach of contract claims are premised on Plaintiffs' alleged wrongful termination of the Franchise and License Agreements and the ADA.  Defendants contend they have performed their obligations under these agreements by substantially complying with their terms and, as to the Franchise Agreements, curing all alleged defects.  As this Court has found that Defendants have breached the Franchise and License Agreements and the ADA, and Plaintiffs validly terminated these agreements, Defendants' claims fail.  Summary judgment in favor of Plaintiffs' on these claims is granted.  For the same reason, summary judgment in favor of Plaintiffs is also appropriate on Defendants' claim for declaratory judgment that Plaintiffs wrongfully terminated these agreements and materially breached the Franchise Agreements.

### D.  DEFENDANTS' CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT IV)

Defendants allege that Plaintiffs have breached the duty of good faith and fair dealing in two ways: (1) by refusing to permit Franchisees to operate their restaurants to achieve profitability promised by not allowing them to increase prices to account for higher costs even though Plaintiffs allegedly allowed other franchises to charge higher prices; and (2) by wrongfully terminating the Franchise and License Agreements.  The second basis is easily dispensed with – the Court has found the terminations to be lawful.  Therefore, it cannot serve as a basis for a claim for breach of an implied covenant of good faith and fair dealing.  As for the first basis, it too cannot survive summary judgment.

Defendants' denial of opportunity to achieve profitability argument is premised on Plaintiffs' refusal to allow Defendants to use the a la carte function to increase the prices set by Plaintiffs[21] – the very conduct which this Court has found violated the terms of the Franchise Agreements.  This claim fails under Colorado and Indiana law.

"[I]t is long settled in Colorado, as it is in many jurisdictions, that the duty of good faith and fair dealing cannot be used to 'contradict terms or conditions for which a party has bargained.'"  *Genova v. Banner Health*, 734 F.3d 1095, 1103 (10th Cir. 2013) (quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo.1995)) (citations omitted); *see also C.K.H., L.L.C. v. The Quizno's Master, L.L.C.*, No. 04-RB-1164 (BNB), 2005 U.S. Dist. LEXIS 42347, at *7 (D. Colo. March 25, 2005).  The duty of good faith and fair dealing "never insinuates itself in the first place in ways and places that undo the parties' expressly bargained-for rights.  Contract law

---

[21] Defendants assert this is just "one example" of Plaintiffs' alleged breach of duty, failing to identify any other conduct.  Defendants cannot simply assert that there is some other unidentified basis to defeat summary judgment.

is, after all, generally about effecting the parties' wishes, not [the court's]." *Banner Health*, 734 F.3d at 1103. As recognized by Defendants, "the purpose of the implied covenant is to effectuate the intent and reasonable expectations of the parties." (Response, ECF No. 87, p. 13) (quoting Plaintiffs' Motion). Accordingly, Defendants' claim fails under Colorado law.

Under Indiana law, "a duty of good faith and fair dealing is implied only in certain kinds of contracts, such as insurance contracts, employment contracts, contracts under the Uniform Commercial Code as adopted in Indiana, and contracts that are 'ambiguous as to the application of the covenants.'" *ArcAngelo, Inc. v. DirectBuy, Inc.*, No. 3:13CV104-PPS/CAN, 2013 WL 6095678, at *3 (N.D. Ind. Nov. 20, 2013) (quoting *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. App. 2011)). "When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made." *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990).

> In other words, courts are bound to recognize and enforce contracts where the terms and the intentions of the parties can be readily determined from the language in the instrument. It is not the province of courts to require a party acting pursuant to such a contract to be "reasonable," "fair," or show "good faith" cooperation. Such an assessment would go beyond the bounds of judicial duty and responsibility. It would be impossible for parties to rely on the written expressions of their duties and responsibilities.

*Key Markets*, 559 N.E.2d at 604.[22]

---

[22] The Indiana Supreme Court noted that there are "equitable principles which might require the court to refuse to recognize the provisions of a contract where there is allegation and proof of fraud, misrepresentation, overreaching, undue influence, unjust enrichment or undue advantage of one party over the other." *Key Markets*, 559 N.E.2d at 604. Defendants' cursory allegation of a "promise" of "profitability," however, is insufficient to require consideration of these principles or overcome the express requirements in the Franchise Agreements that Franchisees comply with Plaintiffs' pricing as set forth in their menus and to participate in promotional programs, such as the $4 menu meals.

In support of their argument, Defendants rely on *Ang v. Hospital Corp. of Amer.*, 182 Ind.

App. 381, 395 N.E.2d 441 (1979) and *Prudential Ins. Co. of Amer. v. Crouch,* 606 F. Supp. 464

(S.D. Ind. 1985).  Defendants' reliance, however, is misplaced as *Ang* involved a contract

covering limited terms of the parties' working arrangement (akin to an employment agreement)

which required the court to infer a contractual term to give meaning to the intention of the

parties, and *Prudential Ins.* involved an implied covenant in an employment agreement.[23]  No

such facts exist here.  Accordingly, Defendants' claim also fails under Indiana law.

### E.  DEFENDANTS' FRAUD CLAIM (COUNT VI)

In order to establish fraud under Colorado or Indiana law, a party must prove that (1) the

defendant made a knowing false representation of a past or existing material fact; (2) the plaintiff

relied on that representation; (3) the plaintiff was justified in relying on the alleged

misrepresentation; and (4) the justifiable reliance resulted in damages.  *Myers v. Alliance for*

*Affordable Servs.*, 371 F. App'x 950, 957 (10th Cir. 2010); CO-JICIV 19:1 (4th ed.);  *ABN*

*AMRO Mortg. Group, Inc. v. Maximum Mortg., Inc.,* 429 F. Supp. 2d 1031, 1041 (N.D. Ind.

2006); *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 580 (7th Cir.

1994).

In Count VI, Defendants alleged that Plaintiffs fraudulently induced them to invest in the

Steak n Shake system by (i) fraudulent statements allegedly made by Plaintiffs' employees and

(ii) fraudulent projections allegedly in the June 2011 FDD.  (ECF No. 51, ¶¶ 14, 16, 18-21, 25-

26, 33-34.)  Plaintiffs argue that Defendants' fraud claim fails as a matter of law for three

reasons: (i) the claim is precluded by the integration and "no representation" clauses in the

---

[23] Similarly, Defendants' citations to the general rule that every contract imposes a duty of good faith and fair
dealing is unavailing as they have not shown that such rule applies under the facts and circumstances of this case.

Franchise Agreements; (ii) the alleged representations were not statements of past or existing

facts; and (iii) the FDD projections are statement of potential sales or opinions, Defendants could

not reasonably rely on them, and Defendants can produce no evidence that such projections were

false or otherwise misleading.  In their Response, Defendants did not address Plaintiffs'

integration/no representation argument.  Instead, Defendants argue Plaintiffs' employees made

"specific statements" explaining the FDD upon which Defendants relied to understand the

agreements.  The "specific statements" allegedly made by Plaintiffs were that "if you bring in

two million dollars" "the profit margin is actually between five and six hundred thousand

dollars" (ECF No. 88-2, pp. 79-80); and statements of assurance on numerous occasions that

Defendants "were going to be highly profitable" and that the "numbers" "were greater than the

21.5% laid in the FDD…as those were conservative numbers."  (ECF No. 88-4, pp. 211, 212).[24]

### 1.  The Integration/No Representation Clauses

Plaintiffs contend the integration and no representation clauses in the Franchise

Agreements preclude Defendants' misrepresentation claims as a matter of law, relying on

Colorado law.  Defendants' response fails to address this argument; therefore, the Court finds

Defendants have waived any argument that a result would be different under Indiana law.

Nonetheless, the Court finds the results would be the same.

Under Colorado law, "[i]ntegration clauses generally permit contracting parties to limit

future contractual disputes to issues relating to the reciprocal obligations expressly set forth in

---

[24] Defendants' Statement of Undisputed Material Facts contains more alleged statements, but they are not supported by the evidence cited.  In addition, Defendants refer the Court to the *allegations* in their Counterclaim at ECF No. 19, at ¶19(e) (the Court assumes Defendants meant ¶18(e)).  But, at the summary judgment stage, a party cannot stand on the allegations in their pleadings to establish a genuine issue of material fact.  *Celotex Corp.,* 477 U.S. at 324 (" Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.")

the executed document. … Thus the terms of a contract intended to represent a final and

complete integration of the parties' agreement are enforceable and parol evidence offered to

establish the existence of prior or contemporaneous agreements is inadmissible to vary the terms

of such contract." *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 72 (Colo. 1991).

However, "the mere presence of a general integration clause in an agreement does not bar a

claim for negligent or fraudulent misrepresentation." *Keller,* 819 P.2d at 73; *see Student*

*Marketing Group, Inc. v. College P'ship, Inc.*, Nos. 05-1427, 06-1046, 247 F. App'x 90, 99,

2007 WL 2269440, at *8 (10th Cir. Aug. 9, 2007).  Instead, the disclaimer of reliance must be

"couched in clear and specific language." *Keller,* 819 P.2d at 74.  Where the integration clause

contains the requisite specific language, it is sufficient to preempt a misrepresentation claim as a

matter of law. *Student Mktg. Group, Inc.*, 2007 WL 2269440, at *7.

> Similarly, under Indiana law:
>
> "An integration clause of a contract is to be considered as any other contract
> provision to determine the intention of the parties and to determine if that which
> they intended to contract is fully expressed in the four corners of the writing."
> *Prall v. Ind. Nat'l Bank*, 627 N.E.2d 1374, 1377–78 (Ind. Ct. App. 1994) (citing
> *Franklin v. White*, 493 N.E.2d 161, 166 (Ind. 1986)).  "Generally, where parties
> have reduced an agreement to writing and have stated in an integration clause that
> the written document embodies the complete agreement between the parties, the
> parol evidence rule prohibits courts from considering extrinsic evidence for the
> purpose of varying or adding to the terms of the written contract." *Id.* … "An
> exception to the parol evidence rule applies, however, in the case of fraud in the
> inducement, where a party was 'induced' through fraudulent representations to
> enter a contract." *Circle Ctr. Dev. Co. v. Y/G Ind., L.P,* 762 N.E.2d 176, 179 (Ind.
> Ct. App. 2002).

*Wind Wire, LLC v. Finney*, 977 N.E.2d 401, 405 (Ind. App. 2012); *see also Judson  Atkinson*

*Candies, Inc. v. Kenray Assocs., Inc.*, 719 F.3d 635, 638-39 (7th Cir. 2013).  "[T]he weight given

to a contract's integration clause [is to] be decided on a case-by-case basis." *Wind Wire, LLC,*

977 N.E.2d at 405.  "[A]mong the many factors that a court may consider is the existence of no-reliance or disclaimer language, as well as the relative sophistication of the parties and the circumstances surrounding the agreement's execution."  *Kenray Assocs., Inc.*, 719 F.3d at 643. And, depending on the facts, a court may rule as a matter of law that the integration provision bars a claim for fraudulent inducement.  *E.g., Prall v. Indiana Nat'l Bank*, 627 N.E.2d 1374 (Ind. App. 1994); *Circle Centre Dev. Co. v. Y/G Indiana, L.P.*, 762 N.E.2d 176 (Ind. App. 2002).

In this case, the Franchise Agreements specifically and clearly provide that they[25] contained the entire agreement between the parties, and that Franchisees were entering into the agreement as a result of their own investigation and not as a result of any representation by Plaintiffs.  Defendants are sophisticated persons with experience in the food and restaurant business, who were represented by counsel and had a CPA review numbers for them, and who did "a lot" of research themselves before entering into the agreements.  It was Defendants who contacted Plaintiffs about opening Steak n Shake restaurants and becoming franchisees.  Further, Defendants acknowledged not once but *twice* that the Franchise Agreements contain the entire agreement between the parties – first in the FCC, then again in the Franchise Agreements themselves.  Under such facts, "it is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying." *Hardee's*, 31 F.3d at 576 (quotation marks and citation omitted); *Colo. Coffee Bean, LLC v. Peaberry Coffee, Inc.*, 251 P.3d 9, 19 (Colo. App. 2010) (quoting *Hardee's*).  The Court finds that, as a matter of law, Defendants' fraudulent inducement claim based on alleged representations of "profitability" and that their profitability

---

[25] The Franchise Agreements also reference other documents which Defendants have not raised as relevant to their claim.

"numbers" were going to be greater than the 21.5% as stated in the FDD are barred by the integration and no representation clause.

### 2. The Statements of Profitability and Projections

Plaintiffs also argue the alleged representations are puffery, opinion, or expressions concerning the future which cannot serve as a basis for a fraud claim. Defendants' response fails to address most of those statements, relying instead on alleged representations relating to "profitability."

Under Colorado law, statements that Steak n Shake restaurants were going to be "high[ly] profitable" and projections regarding future profitability, however, are "mere puffery" which "cannot be the basis of *any* misrepresentation claim." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106, 1108 (10th Cir. 2009) (emphasis in original). They are also not representations of *past or existing facts*, but are representations regarding the future, which are not actionable. *Myers v. Alliance for Affordable Servs.*, No. 08-1354, 371 F. App'x 950, 957, 2010 WL 1340229, at *5 (10th Cir. April 7, 2010) ("A mere expression of an opinion in the nature of a prophecy as to the happening or non-happening of a future event is not actionable.") (internal quotation marks and citation omitted). The same holds true under Indiana law. *See Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir. 1986) ("In a sales or marketing context, and franchisor-franchisee negotiations certainly are to be placed in that context,… expressions of opinion are known as 'puffing,' 'trade talk,' or 'sales talk' and do not constitute actionable fraud."); *Paulson v. Centier Bank,* 704 N.E.2d 482, 491 (Ind. App. 1998) (representations regarding future conduct cannot support action for actual fraud); *Anderson v. Indianapolis Ind. AAMCO Dealers Advertising Pool*, 678 N.E.2d 832, 837 (Ind. App. 1997) ("Actual fraud may not be based on representations

of future conduct, on broken promises, or on representations of existing intent that are not executed."). As such, the statements cannot support a claim for fraud.

### 3. The Statements of Projected Earnings in the FDD

In their *allegations*, Defendants asserted that Item 19 of the FDD was false or misleading in a number of ways, including having higher projected sales volumes than actual sales, having projections which significantly overstated the expected profit, understating projected costs, and withholding operating expenses of four franchised restaurants which would have shed light on the misleading nature of representations in Item 19. In their *Response*, Defendants rely on the alleged statements of profitability which the Court has already found insufficient. In addition, Defendants rely on their *contention* – the allegations – in their claim to support that the estimated 21.5% profitability was not supported by the facts or that Plaintiffs knowingly withheld information.

First, Defendants have not shown that the projections in the FDD are false, and the assertion that *their* restaurants did not perform as well is not sufficient to create an inference that the projections in the FDD are false. *See Qdoba Rest. Corp. v. Taylors, Inc.*, No. 08-cv-01179-MSK-KMT, 2010 WL 1240410, at *5 (D. Colo. March 23, 2010) (evidence that franchisees' restaurants did not perform in accordance with projections insufficient, by itself, to create an inference that the projections were false when made and that franchisor knew they were false) (applying Florida law).

Next, Item 19 specifically stated the numbers were estimates, that there were no assurances that Defendants would do as well; that "[i]f you rely upon our figures, you must accept the risk of not doing as well"; and that food costs, labor costs, and supply costs "will

vary" depending on a number of factors.  As Plaintiffs have pointed out, Defendants conducted

their own research – they had their CPA look at the numbers in Item 19, they consulted with

their attorneys, and they did their own calculations.  In light of this evidence, Defendants could

not have justifiably relied on these projections *as their own.*[26]  *See BP W. Coast Prods. LLC v.*

*SKR Inc.*, 989 F. Supp. 2d 1109, 1120 (W.D. Wash. 2013) (Even assuming reliance on alleged

statements, "reliance would not be justified because it is directly contradicted by the express

terms of the franchise agreements…."); *see Myers*, 2010 WL 1340229, at *6 (summary judgment

proper where, as a matter of law, there was no triable issue regarding plaintiffs' justifiable

reliance on alleged fraudulent statements).

Finally, at the summary judgment stage, a party cannot stand on the allegations in their

pleadings to establish a genuine issue of material fact.  *Celotex Corp.,* 477 U.S. at 324.

Accordingly, Defendants' reliance on their allegations in their counterclaims is also insufficient

to defeat Plaintiffs' request for summary judgment as to the fraud claim.

### F.  DEFENDANTS' TORTIOUS INTERFERENCE CLAIM (COUNT VIII)

Defendants' Count VIII alleged intentional interference with prospective economic

advantage, asserting Plaintiffs have intentionally and improperly interfered with Defendants'

efforts to transfer their Franchise and License Agreements to third parties in August 2013.  (ECF

No. 51, pp. 37, 38.)  In order to establish a claim for tortious interference with a business

relationship or prospective economic advantage, the interference must be intentional and illegal

or otherwise improper.  *E.g., Eshak v. Marathon Petroleum Co, LLC*, No. 2:11 CV 101  PPS,

---

[26] Although not raised by the parties, the Franchise Agreements stated that Plaintiffs did not intend to disclaim the representations in the FDD.  (*E.g.,* ECF No. 11-4, Section 16.9.)  Those representations, however, are of *other restaurants.*

2012 WL 405672, at *7 (N.D. Ind. Feb. 8, 2012) (defendant must have acted "illegally") (citing *Furno, D.C. v. Citizens Ins. Co. of America*, 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992)); *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995). Plaintiffs argue their conduct was not improper because they had the right to approve any sale or transfer of the Franchise Agreements. In Response, Defendants did not address Plaintiffs' arguments. Instead, Defendants argue Plaintiffs have tortiously interfered with a contractual relationship – the one between Plaintiffs and Defendants – by "conspiring" with Tom Caruso to "eliminate Defendants from the equation." (ECF No. 87, pp. 15, 16 ("[D]espite the fact that Steak n Shake is a party to the agreements it interfered with, its interference is actionable under the law.").) By Defendants' failure to respond to the argument and, instead, arguing another theory of liability, the Court deems this claim waived or abandoned. *See Haltom v. Great Northwest Ins. Co.*, No. 10-6258, 2012 WL 311678, *5, 460 F. App'x 751, 756 (10th Cir. Feb. 2, 2012) (litigant's failure to raise claim, as she did in her complaint, forfeited such claim on appeal).

Defendants' claim now is one for "civil conspiracy" to interfere with the Franchise Agreements. Plaintiffs argue dismissal is appropriate as this claim was never pled.[27] The Court agrees[28] that claim was never pled in Defendants' counterclaim, and it is also not contained in the Final Pretrial Order. (ECF No. 94, p. 9.) Therefore, the Court will not consider it now in ruling on Plaintiffs' Motion. *See Salazar v. City of Commerce City*, No. 12-1390, 535 F. App'x 692, 694-95 (10th Cir. Sept. 23, 2013) (district court did not abuse discretion in declining to consider claim in its summary judgment ruling where such claim was not included in final

---

[27] In light of this finding, the Court need not decide whether this new claim would nonetheless fail on the merits.

[28] To the extent Defendants are also asserting interference with the License Agreements and ADA, the analysis and conclusions apply equally to such agreements.

pretrial order, was a different theory of recovery with different requirements of proof, and where plaintiff had not sought to amend the order to include the theory); *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994) ("Much of the value of summary judgment procedure in the cases for which it is appropriate would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should that theory prove unsound, come back along thereafter and fight on the basis of some other theory.") (quoting *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469–70 (5th Cir.1967)) (internal alterations omitted).

### G. DAMAGES

In addition to requesting damages under their trademark and unfair competition claims, Plaintiffs also seek damages caused by Defendants' actions, along with fees and costs under various theories.  Plaintiffs may raise their request for damages, along with any remaining issues, at the status conference.

## VI.  CONCLUSION

Based on the foregoing, it is

(1) **ORDERED** that Plaintiffs' Motion for Summary Judgment (ECF No. 81) is **GRANTED** as stated herein; and it is

(2) **FURTHER ORDERED** that the preliminary injunction issued by Order dated September 3, 2013 (ECF No. 48) is hereby made permanent as to the use of Plaintiffs' Marks in accordance with the **PERMANENT INJUNCTION** issued concurrently with this Order; and it is

(3) **FURTHER ORDERED** that the bench trial set to begin on July 20, 2015 is

**VACATED**; and it is

(4) **FURTHER ORDERED** that an in-person status conference shall be held at 1:00

p.m. on Thursday, July 16, 2015 at the Alfred A. Arraj United States Courthouse, 901

19th Street, Courtroom A601, Denver, Colorado 80294.   The parties shall be

prepared to discuss what issues they contend remain that requires resolution, whether

a bench trial or evidentiary hearing is required on any remaining issues, and all other

relevant matters.

DATED this 23rd day of June, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge